Bruce Evert **CHEVALIER**, Respondent,

v.

**DIRECTOR OF REVENUE, STATE OF MISSOURI**, Appellant.

No. WD 51848.

Missouri Court of Appeals, Western District.

Submitted May 20, 1996.

Decided Aug. 20, 1996.

389

Jeremiah W. (Jay) Nixon, Atty. Gen., Jefferson City, Jane A. Barkley, Sp. Asst. Atty.

Gen., Mo. Dept. of Revenue, Independence, for appellant.

Charles E. Weedman, Jr., Harrisonville, for respondent.

Before LAURA DENVIR STITH, P.J., and ULRICH and SMART, JJ.

SMART, Judge.

The Director of Revenue ("Director") appeals a decision in favor of Bruce Chevalier in his appeal of an administrative suspension for driving with an excessive blood alcohol content. The trial court found that the Director failed to prove the blood alcohol content ("BAC") of Mr. Chevalier at the time of his detention. The Director argues that the trial court erred in excluding testimony concerning the result of a breathalyzer test. The judgment of the trial court is reversed and the cause remanded for a new trial.

On August 25, 1995, shortly before 2:00 a.m., Officer Jon Bledsoe of the Police Department of Peculiar, Missouri, observed a vehicle, driven by Chevalier, exceeding the speed limit. The vehicle was traveling at a speed of 45 miles an hour in a 30 mile an hour zone. Officer Bledsoe pulled Chevalier over. He noticed that Chevalier's speech was slurred, he was having trouble with simple functions and that there was a cooler open in the car containing three beers with an empty beer bottle on the floor of the vehicle. Officer Bledsoe attempted to administer a series of field sobriety tests. Chevalier refused to take the walk-and-turn test and the horizontal gaze nystagmus test. He failed the one-leg-stand test by almost falling down. He was also unsuccessful in his recitation of the alphabet. Officer Bledsoe formed the opinion that Chevalier was intoxicated and arrested him for driving while intoxicated. Chevalier was transported to the Cass County Sheriff's Department and asked to take a breath test. After being advised of his rights, he informed the officer he had been at a party, and that he had consumed five or six beers from about 9:00 p.m. to about 11:30 p.m.

Trooper Clinton Carlyle was requested to give a breath test to Chevalier. After consulting with an attorney, Chevalier consented to take the test. At trial, Trooper Carlyle testified that the instrument produces a print-out and also displays the result on the instrument itself. Counsel then asked the witness to state the results of the test. Counsel for Chevalier interrupted to ask permission to voir dire the witness in anticipation of making an objection. The court granted permission, and the voir dire of the witness proceeded as follows:

Q: Officer Carlyle, the BAC Verifier gives you a print-out, correct?

A: Yes.

Q: And from that print-out you're able to determine the breath alcohol level of the person tested, correct?

A: Yes, it furnishes a copy; it also reads it out on the machine.

Q: Right. But it gives you a copy that tells you what that person's breath measured.

A: Yes.

Q: And do you have that with you?

A: No. I have a copy.

Q: Where is the original of that document?

A: The original I give to the arresting officer. When I administer a test for someone else, I give the original to the arresting officer.

Q: Okay. Do you have the copy with you?

A: I have a copy. It's sort of hard to read.

Q: More than hard to read, I think. In fact, someone, on the copy you have, has even written in, in ink, some things.

A: No, that was on the original.

Q: It was?

A: Yes. I write my name, the badge number, and the—

Q: The defendant.

A: Yes, that was on the original.

Q: Okay.

A: It was just written better than what the machine writes.

[Counsel for Chevalier]: Your Honor, I would object to this witness testifying to the results of the BAC Verifier machine, because it's obviously hearsay, based upon the print-out that is produced by the ma-

chine, and I think that original print-out is necessary to be produced by the Department of Revenue, and so his testimony is not the best evidence as to what the machine recorded.

THE COURT: Well, in this case based on the poor quality of the copy, unless he has independent recollection of what he observed off the machine, and I don't think that's going to be the case—you don't know what it said absent—right now, you can't tell me what it said without looking at the copy?

A: I can't now. I mean, I looked at that time, earlier.

THE COURT: Right. Based on the quality of that copy, I'll sustain that objection.

Counsel for the Director of Revenue, in an offer of proof, elicited the testimony of the witness that the test revealed a blood alcohol content level of .109 percent. The Director now appeals the ruling excluding the testimony of Trooper Carlyle as to the results of the test. The Director contends that the trial court erred because the best evidence rule does not apply to the admission of a breathalyzer test result and the testimony of Trooper Carlyle was competent evidence of the test result.

■ The State was required to establish that Chevalier's blood alcohol concentration was "ten-hundredths of one percent or more by weight...." *§ 302.505.1, RSMo 1994.* The State attempted to establish Chevalier's BAC through testimony given by the trooper who administered the breath test, Trooper Carlyle. The foundational prerequisites for admission of the test results are tri-fold: (1) that the test was performed according to the approved Division of Health techniques; (2) that the operator of the test held a valid permit; and (3) that the equipment was approved by the Division. *Sellenriek v. Director of Revenue,* 826 S.W.2d 338, 340–41 (Mo. banc 1992). Each of these foundational requirements was met in this case. Trooper Carlyle testified that the instrument he used to give the test to Chevalier was a BAC Verifier, serial number 404065. This instrument is approved by the Department of Health. Trooper Carlyle had a valid permit to operate the machine and he testified that

he followed the BAC Verifier checklist and that there was no deviation from procedure. He further testified that the instrument was functioning properly. There is no suggestion that the illegibility of the print-out interfered with the proper function of the machine. The issue was the admissibility of testimony as to the test results when the print-out is unavailable or illegible.

The trial court believed that the trooper should not be permitted to testify as to the reading on the display, nor as to the tape print-out, since the only available copy of the print-out was illegible. Counsel argued that testimony concerning the reading on the display was inadmissible on grounds of hearsay, and any testimony concerning the print-out reading was inadmissible on grounds of the best evidence rule. The trial court sustained the objection to the officer's testimony as to the test result. The Director contends on appeal that the trial court erred.

### *Best Evidence Rule*

■ Ever since the first recorded references to the "best evidence" in very old English decisions, there have been a variety of views as to the nature of the principle underlying the catch-phrase. *McCormick on Evidence,* § 229 (4th ed. 1992). However, it is generally agreed by courts and commentators today that the rule does not necessarily mean that no evidence other than the "best" and most reliable will ever be permitted. *Id.* Otherwise, no one would ever be permitted to testify as to his or her age (because a birth certificate would be the best evidence) or to describe a tangible item without producing the item itself. *See State v. Curry,* 473 S.W.2d 747, 748 (Mo.1971) (best evidence rule does not require exclusion of oral testimony by witness that he was owner of car even though he did not have certificate of ownership with him). Consequently, scholars and courts agree that the principle is limited to proof of the operative terms of substantive written documents. *Cooley v. Director of Revenue,* 896 S.W.2d 468, 470 (Mo. banc 1995). The rule stated is this: in proving the terms of a writing, where the terms are material, the original writing must be produced unless it is shown to be unavail-

able for some reason other than the serious fault of the proponent. *McCormick on Evidence,* § 230 (4th ed. 1992). This is, of course, a common sense rule, in view of the fact that disputes involving the operative provisions of documents such as deeds, wills and contracts are instances in which a slight variation in wording may make a huge difference in terms of dispositive effect. *Cooley,* 896 S.W.2d at 470. Also, in the giving of oral testimony as to writings, there is probably a greater risk of error than in the giving of oral testimony related to other situations generally. *McCormick on Evidence,* § 231 (4th ed. 1992). Such documents may easily be misunderstood or misinterpreted.

 The best evidence rule should be applied with common sense and a distinction should be recognized between the true purposes of the rule and spurious purposes. *See 4 Wigmore,* Evidence § 1179–1182 (Chadbourn rev. 1972). Otherwise, it becomes an arbitrary tyrant which stands in the way of reasonableness and hinders the search for truth. For this reason, the rule is not applied to every writing. For instance, when the officer offers testimony that Chevalier was traveling 45 miles an hour in a 30 m.p.h. zone, he is not required to bring into court the speed limit sign (or the city ordinance setting the speed limit for that location) and offer it into evidence. Nor must an officer testifying as to a license plate number bring the license plate to court as an exhibit to be received in evidence. *See, e.g., Quillen v. Commonwealth,* 284 Ky. 792, 145 S.W.2d 1048 (1940). The Missouri Supreme Court has attempted to clarify some of the confusion about the best evidence rule in *Cooley v. Director of Revenue,* 896 S.W.2d 468 (Mo. banc 1995). In that case the court reversed a trial court ruling excluding oral testimony by an officer that he was a certified peace officer and a Type III permittee where the officer did not have his certificates with him. The court there stated:

There appear to be at least two misconceptions regarding the best evidence rule: 1) that every fact must be proved by the best evidence available to the exclusion of any other evidence; and 2) that whenever a fact is evidenced by a writing, the writing

is the only evidence which may be admitted. Neither proposition is true.

*Id.* at 470.

 In this case, in evaluating the best evidence objection, we look to whether it makes sense to apply the rule in the context in question. The trial court of course, is allowed broad discretion in determining whether the best evidence rule should be applied. *Lewis v. Bucyrus–Erie, Inc.,* 622 S.W.2d 920, 925 (Mo. banc 1981). Nevertheless, in order for the rule to be applicable, a witness must be purporting to testify as to his or her observation of the operative terms of a substantive written document. It is usually applicable to testimony as to the content of documents such as deeds or wills. The real reason for the rule is twofold: (1) as to secondary copies of an original document, there was a concern as to copyist's errors: and (2) as to oral testimony, based on recollection of an original document, there was a concern of accuracy "due to the difficulty of carrying in the memory literally the tenor of the document." *4 Wigmore, Evidence* § 1179 (Chadbourn rev. 1972).

 Here, Trooper Carlyle was asked by the Director's counsel to state the *result* of the test. He was not asked specifically to describe the content of the print-out produced by the breathalyzer. Thus, he could have based his answer on his observation of the display meter on the machine, or, more likely, on his observation of both the display and the print-out. At that point in the testimony, counsel for Chevalier obtained permission to voir dire the witness in anticipation of making an objection. In his questioning, counsel then very shrewdly sought to convey the notion that the testimony as to the result would be based *exclusively* on the inscription on the print-out:

Q: Officer Carlyle, the BAC Verifier gives you a print-out, correct?

A: Yes.

Q: And *from that print-out* you're able to determine the breath alcohol level of the person tested, correct? (emphasis added)

The officer answered the question, but, in answering, also attempted to point out that

the print-out is *not* the exclusive source of information as to the test result:

> A: Yes, it furnishes a copy; *it also reads out on the machine.* (emphasis added).

Counsel then quickly brought the focus back to the print-out in order to lay the groundwork for the objection on grounds of the best evidence rule:

> Q: Right. But it gives you *a copy* that tells you what that person's breath measured.
>
> A: Yes.
>
> Q: And do you have that with you?

Thus, as soon as counsel established that the only copy the officer had with him was illegible, counsel was ready to make his objection. The court, then, observing the illegibility of the copy, sustained the objection.

We note that this is not a case in which the court exercised its discretion to sustain an objection to a question seeking testimony *as to what the print-out said.* Nor is it a case in which the court sustained an objection to a question about the test results when the print-out is the exclusive means of determining the test result. However, this is the precise point at which confusion may have entered, although additional questioning by the Director revealed that the print-out was not the exclusive indicator of the test result.

> Q: Did you complete any forms when you gave the test?
>
> A: Yes.
>
> Q: Okay. What did you complete?
>
> A: I complete the form on the AIR report, the alcohol influence report, and I record on there what *I see on the machine* and the print-out. (emphasis added).

The Director's counsel then established through the testimony of the witness that the alcohol influence report was prepared contemporaneously with the events described, and accurately reflected his observations at the time of the test. Counsel then again asked the witness about the "results" yielded by the test. Counsel for Chevalier renewed his objection. The court, at this point, had reason to see that the testimony the Director sought to elicit was not merely a description of what was shown on the print-out. None-

theless, the court sustained the objection once again, indicating that the testimony as to the test result would not be admissible because "the tape needs to be there."

This case illustrates how confusing the best evidence rule can be, and demonstrates that the trial judge must be prepared to ask whether it really makes good common sense, in the circumstances of the particular case, to exclude the testimony in question. It may be helpful to consider whether the case at hand presents a fact situation similar to a case in which a witness is purporting to describe the operative provisions of a will or a deed. In the case of a will or a deed, the document itself establishes the operative provisions. Those provisions simply do not exist apart from the document itself. If the document is in existence, and is not produced by the party offering testimony as to the terms of the document, the opposing party should be able to object, and to block the admission of such testimony if the offering party refuses to produce the document itself. In that circumstance, the rule serves as an aid to getting at the truth. Without the document itself, such testimony, even offered in good faith by an unbiased and truthful witness, could still disastrously mislead a court or jury due to that witness' inability to accurately understand or interpret the operative terms.

■ If a fact exists independent of the writing, then the best evidence rule does not apply to prohibit testimony as to the fact. *Cooley,* 896 S.W.2d at 470. In this case, there was a reading shown on the breathalyzer display. That reading was observable independent of the print-out. The result of the breathalyzer test was independent of the print-out in the sense that the print-out was not the exclusive means of determining the result of the test.

■ If the print-out function of the machine does not work, or if the print-out is illegible, or *even if there is a legible print-out that is not produced at trial,* it would also be unnecessary to exclude altogether the testimony as to the result of the test. The danger that the result of the test will be misunderstood or misinterpreted (by a per-

son trained to administer the test) is minimal to non-existent. The best evidence rule does not arise out of a concern that people may prevaricate. If it were otherwise, then the rule should be applied to all kinds of evidence, and not just writings. *4 Wigmore, Evidence* § 1180 (Chadbourn rev. 1972). Rather, it arises out of the concern that even the good faith witness may find it difficult to accurately remember the exact terms of written documents. *Id.* Of course, there is always a risk that a witness will fabricate testimony. That is a risk that is always present, regardless of the nature of the testimony; and we rely upon cross-examination to expose such false testimony. In a breathalyzer case, the fact that a print-out is illegible or is lost is relevant to cross-examination, and may be considered by the fact-finder in determining whether the Director has carried her burden of proof. That is a matter for cross-examination, not a determinant of the admissibility of the testimony in the first place. If *all* we are concerned about is whether the witness is being truthful, the best evidence rule need not be invoked to exclude the testimony altogether. *Id.* Thus, the rule should generally be reserved for cases in which there is a risk of mistake or misinterpretation of the terms of the document.

In this case, the witness was prepared to describe the result of the test as it was reflected *on the machine's digital display and on the print-out.* There seems to be little danger that the terms of the print-out will be misunderstood or misinterpreted. The danger is that the witness will not be truthful, a danger faced routinely in court. Whether or not there is a print-out is not particularly significant for purposes related to *admissibility* of testimony as to the re-

sults reflected on the machine's display. A print-out becomes significant in this context only if it is shown that there is a disparity between the alleged reading on the display and the reading shown on the print-out. Having an illegible copy of a print-out is equivalent to having no print-out. The officer in this case testified that he gave the original of the print-out to the arresting officer and kept the photostatic copy.[1] He recorded the display reading in his report, which he completed at that time. Like any other witness, he is subject to cross-examination, and any evidence of allegedly suspicious circumstances (such as the failure to produce a legible copy) can be elicited through cross-examination and evaluated as to the matter of credibility. It is unnecessary to exclude the testimony altogether on the basis that the only copy of the print-out he brought to court is illegible, when he is able to testify that he observed the display and recorded the reading in his contemporaneous report, which he brought to court.

We have previously held that it is not necessary for the testing officer to produce a print-out of the blood alcohol results, even when the machine which was used is one capable of producing a print-out. In *Tomkins v. McNeil,* 782 S.W.2d 400 (Mo.App. 1989), this court held that the trial court had erred in directing that Tomkins' suspension be set aside because the machine failed to produce a print-out. Recently, in *Tebow v. Director of Revenue,* 921 S.W.2d 110, 113 (Mo.App. W.D. 1996), we reversed this trial court in a case involving similar facts (an illegible print-out), holding that the Director had met her burden of showing an excessive blood alcohol level in spite of the illegibility of the print-out. We agree that the test

1. One thing that could have added some confusion here is that the procedural steps formerly specified in 19 CSR 20–30.060, provided that when the test result have been printed out, the testing officer should write the subject's name, and the officer's name and badge number on the print-out tape, and then attach the print-out to the blood alcohol test report. *See Tomkins v. McNeil,* 782 S.W.2d 400, 401 (Mo.App.1989). Here, the testing officer gave the original copy of the print-out to the arresting officer after making the required notations, and kept an illegible photostatic copy, which was attached to his test

report. The record does not show whether or not the original tape was illegible. If the trial court believed that the former regulation were still in effect, she may have, *sua sponte,* excluded the testimony as to the results, concluding that the regulations were not followed. Indeed, her remark that "the tape needs to be there," suggests that she may have based her ruling on the fact that the original tape was not attached to the report. In any event, the former regulation was not in effect at the time of this trial, and counsel for Chevalier does not attempt to justify the court's decision on that basis.

equipment should function so as to produce a legible print-out, and that the original should be produced at trial. However, the failure to have such a print-out at trial does not necessarily preclude testimony as to the test results. We conclude that the invocation of the best evidence rule to preclude testimony concerning the test results was a misapplication of the best evidence rule. The exclusion of the testimony was error.

### Hearsay

Chevalier also attempts to justify the exclusion of the testimony on the grounds of hearsay. He contends that permitting the officer to testify as to the reading of the blood alcohol display would be inadmissible hearsay. His hearsay objection at trial was apparently based on the notion that since the officer did not have an independent recollection of the test reading, he could not be permitted to testify from the report he completed contemporaneously with the test because it would be inadmissible hearsay. That objection is without merit. It is well established that "past recollection recorded" is an exception to the rule that hearsay evidence should be excluded. *State v. Patton,* 255 Mo. 245, 164 S.W. 223 (Mo.1914); *S & H Concrete Constr. Co. v. Genova,* 384 S.W.2d 816, 820 (Mo.App.1964). The trial court's ruling excluding the breathalyzer testimony is not saved by the hearsay objection made at trial by Chevalier.

### Conclusion

The trial court erred in excluding testimony concerning the results of the blood alcohol test. The judgment of the trial court is reversed. The cause is remanded to the circuit court for a new trial.

All concur.