STATE of Missouri, Plaintiff–
Respondent,

v.

Anthony D. HUGHES, Defendant–
Appellant.

No. 19224.

Missouri Court of Appeals,
Southern District,
Division One.

Oct. 31, 1994.

Motion for Rehearing or Transfer
Denied Nov. 22, 1994.

Sustained and Cause Ordered Transferred;
Retransferred to the Court of Appeals
Jan. 24, 1995.

Order Transferring and Retransferring
Cause Vacated;
Application to Transfer Denied Jan. 30, 1995.

Craig A. Johnston, Office of the State Public Defender, Columbia, for defendant-appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Jennifer A. Glancy, Asst. Atty. Gen., Jefferson City, for plaintiff-respondent.

FLANIGAN, Judge.

The trial court, after a jury-waived trial, found defendant guilty of trafficking drugs in the second degree, § 195.223,[1] RSMo Supp. 1993, (Count I), and possession of more than 35 grams of marijuana, § 195.202, RSMo Supp.1993, (Count II), and he was sentenced to concurrent sentences of twelve years' imprisonment on Count I and three years' imprisonment on Count II. Defendant appeals.

Both charges arose out of events which occurred on February 18, 1993, at the Greyhound bus terminal in Springfield. This proceeding was initiated by an indictment. In a prior proceeding, initiated by an information containing the same charges as the indictment, defendant filed a motion to suppress certain evidence. A hearing was held on that motion before Judge Don Bonacker who sustained it in part and overruled it in part. The state dismissed the prior proceeding.

Defendant filed a motion to suppress items, including those items which Judge Bonacker had suppressed. The trial court overruled the motion. Defendant waived trial by jury and the case proceeded to trial.

---

1. Except where otherwise indicated, all references to statutes are to RSMo 1986, V.A.M.S.

■ Defendant's first point is that the trial court erred in not suppressing the items of evidence which Judge Bonacker suppressed in the first proceeding. Defendant argues that this ruling deprived him of "due process" and the benefit of the doctrine of collateral estoppel. Similar contentions were raised and rejected in *State v. Beezley,* 752 S.W.2d 915 (Mo.App.1988) and *State v. Pippenger,* 741 S.W.2d 710 (Mo.App.1987).

In *Pippenger,* the court held that the doctrine of collateral estoppel did not apply because the prior adjudication (in this case Judge Bonacker's ruling) was not a judgment on the merits. The court said that a ruling on a motion to suppress evidence prior to trial is interlocutory in nature and is not binding on future proceedings. The court pointed out that the state has a "discretionary right to dismiss a case at any time" and could refile the charges so long as double jeopardy has not attached. Defendant was not in jeopardy at the time of the ruling on the motion. In *Beezley,* this court, with Judge Maus dissenting, agreed with *Pippenger* on similar facts. Defendant's first point has no merit.

Defendant's second point is that the trial court erred in overruling his motion to suppress physical evidence (marijuana, cocaine in base form, and a baggage claim ticket) and his statements, because the evidence was obtained in violation of his rights under the Fourth, Fifth, and Fourteenth Amendments to the U.S. Constitution, and Article I, §§ 15 and 19 of the Missouri Constitution, in that: (a) defendant was detained, although the officers lacked an adequate basis to form a reasonable, articulable suspicion of ongoing criminal activity to justify his detention, defendant was detained in part because he was African–American, defendant was illegally detained by a show of authority which conveyed the message that compliance with the officer's request was required, and statements made by defendant were given while he was unlawfully detained; (b) defendant's suitcase was detained, seized and searched without warrant, probable cause, or reasonable articulable suspicion, the seizure of the suitcase was not sufficiently limited in scope and duration, the search and the seizure of

his suitcase were unconstitutional as fruits of the poisonous tree due to the preceding unconstitutional detention of defendant; and (c) the state did not sustain its burden of proving that defendant's consent to the search of his person and his suitcase was voluntary and, in any event, the consent was not sufficiently attenuated to be purged from the taint of the officers' unconstitutional conduct.

■ Appellate review of a ruling on a motion to suppress is limited to determining the sufficiency of the evidence to sustain the trial court's finding. *State v. Villa–Perez,* 835 S.W.2d 897, 902[9] (Mo. banc 1992). The weight of the evidence and the credibility of the witnesses are matters for the trial court's determination. *Id.* at 901. The appellate court considers the facts and the reasonable inferences of those facts in the light most favorable to the trial court's ruling. *State v. Rodriguez,* 877 S.W.2d 106, 110[11] (Mo. banc 1994).

The appellate court will reverse only if the trial court's judgment is clearly erroneous. *State v. Milliorn,* 794 S.W.2d 181, 183[5] (Mo. banc 1990). "If the trial court's ruling is plausible in light of the record viewed in its entirety," the court "may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." *Id.* at 184. For the reasons which follow, this court holds that the trial court did not err in overruling defendant's motion to suppress.

On February 18, 1993, Detective Mark Deeds and Detective Dana Carrington of the Springfield Police Department, and Carl Hicks, a narcotics investigator with the Drug Enforcement Administration, were working together under a program entitled "Proactive Common Carrier Interdiction." They were watching the Greyhound bus station in Springfield for narcotics couriers carrying drugs. They were interested in the 12:20 p.m. bus because it originated in Los Angeles and was eastbound. In the past the officers had made "large drug seizures from this bus," 25 or 30 seizures prior to this one.

Deeds saw defendant, a 17–year–old black male, walk to a pay phone. After defendant used the phone, Deeds engaged him in conversation. Deeds told defendant he was a

police officer and showed him his badge and asked if he minded if he spoke with him a few minutes. Defendant said he did not mind.

Deeds testified: "The fact that defendant is black was not one of the factors that led to my initial attention toward him. I conducted a pat-down search of his outer body. I thought he might be armed because he was wearing baggy pants and a baggy jacket. I asked him if he would mind if I patted him down, and he raised his arms up."

Deeds asked where he was going, and defendant said "Fort Wayne, Indiana." Defendant said he was traveling from Los Angeles. Defendant showed Deeds his bus ticket, which was a one-way ticket which had been purchased for cash at 5:12 p.m. on February 16, 1993, in Los Angeles. Deeds testified that people involved in trafficking controlled substances will go to the bus terminal "at the last minute, at the time they begin traveling, and will pay with cash and purchase a one-way ticket." Deeds gave the ticket back to defendant. Defendant told Deeds he did not have any luggage on the bus and was on his way to a family reunion in Fort Wayne where he would stay two or three days.

Defendant gave Deeds his real name and said that he did not have any identification. Deeds thought it was strange that defendant didn't have any luggage. Deeds testified that not having identification "is a common trait of drug couriers." Deeds said that defendant appeared to be extremely nervous, that he was visibly shaking when he handed Deeds the ticket, and that defendant was slow to respond to his questions, "as if he was thinking of an answer." According to Deeds, no more than two to two and a half minutes had elapsed since the initiation of the conversation. Deeds thanked defendant for his cooperation and walked away.

Officer Hicks testified that defendant caught his attention because of his demeanor. Defendant appeared to be looking furtively around the bus station. Defendant attracted Hicks' attention "by walking straight to a pay phone." Hicks said, "I have known drug couriers who go straight to a pay phone so they can call the person who owns the drugs

and let them know where they are, or call the customer who is waiting for the drugs and tell them when they are going to be there. That is definitely suspicious."

Officer Hicks testified that he was present when Deeds initially interviewed defendant. Hicks then investigated to see if defendant had a checked suitcase. Hicks checked the luggage compartment of the bus and found a suitcase booked from Los Angeles to Fort Wayne. It had a baggage claim number but did not have the required identification tag. It did not have a name or address. The identification tag calls for the name and address.

Hicks took the suitcase and talked to the bus driver. The driver told Hicks that only one passenger was ticketed from Los Angeles to Fort Wayne.

After his initial conversation with defendant, Officer Deeds talked to Hicks. Hicks told him that he had located a suitcase in the luggage compartment, that it was marked to Fort Wayne from Los Angeles, and that only one person was so ticketed.

Based on the information he received from Hicks, Deeds "went back to talk with the defendant again." Deeds testified: "I thought there was a strong possibility defendant owned the bag. I asked if he minded speaking with me again, and he told me he did not. Maybe five minutes had elapsed since I had just left defendant's presence. I told him he was not under arrest and was free to leave and I was not detaining him. I asked him if he would accompany me to the drivers' lounge because there were two buses there, both running, and it was noisy. People were standing around. Defendant said 'that's okay.' The lounge was only ten feet away."

Hicks testified that during the investigation in the drivers' lounge, Deeds told defendant that defendant was free to leave. Hicks also testified: "I would not have let the bag go anywhere. I strongly believed it belonged to the defendant, but at that point defendant still had not claimed this bag, he was still denying ownership of it."

Hicks testified that after he got the suitcase he took it to the drivers' lounge and gave it to Deeds. The drivers' lounge is a separate room inside the bus station. Hicks testified that he believed there was something illegal inside the suitcase because he felt defendant was lying. Hicks thought that "there was probably drugs in the suitcase."

Deeds testified: "After learning there was one person riding the bus from Los Angeles to Fort Wayne, I believed that was defendant's bag and that he was lying to me. I suspected the bag contained contraband because I thought he was lying to me to conceal something."

The drivers' lounge was a small room with no windows except the window in the door. There was some furniture in it. The door closed automatically "when you walk in." All three officers were present with defendant in the lounge.

After the group had entered the lounge, Deeds asked defendant if he would consent to emptying his pockets, and defendant did so. Deeds asked defendant if he had any luggage claim tickets hidden on his person, and defendant said he did not. After Deeds did not locate a baggage claim ticket, he asked defendant to remove his shoes. Deeds told defendant he didn't have to take his shoes off if he didn't want to. Defendant said, "I want to show you," and removed his right shoe. A claim ticket was in that shoe, and the numbers on the claim ticket were the same as the numbers on the suitcase.

Deeds testified, "Until we found the luggage claim check, defendant had never claimed ownership of any luggage on the bus." Deeds told defendant that the numbers on the baggage claim ticket matched the numbers on the suitcase. Deeds asked defendant if that was his suitcase, and defendant said it was. At that point, Deeds gave defendant the Miranda warnings. Defendant told Deeds that he understood "those rights."

Deeds asked defendant if he knew what was in the suitcase. Defendant replied that the suitcase was his and he knew there were drugs in it but didn't know what type of drugs or the quantity. Defendant said that the suitcase had been provided him by a woman and that he knew she had placed drugs in it. Defendant said he was to be paid $1,000 to $2,000 for delivering the suitcase, in Fort Wayne, to an individual known as "Dog."

After defendant said the suitcase was his, Deeds asked him if the officers could search the suitcase and recover the drugs that were in it. Deeds told defendant he didn't have to give permission to search. Defendant told Deeds he could open the suitcase.

Search of the suitcase by the officers disclosed two bundles of objects repeatedly wrapped in duct tape. Deeds had observed similar wrapping in narcotics trafficking. One bundle contained processed marijuana, and the second contained crack cocaine. Deeds then placed defendant "under full custodial arrest" and began questioning him about the events surrounding his trip.

Defendant told Deeds that he had met "the woman" at the bus station in Los Angeles and she had purchased his bus ticket. Defendant gave the woman his suitcase which she took out of his view and "placed something in it which he knew was drugs but did not know what type or quantity." Deeds testified: "It appeared to me that defendant was making up the story as he went along. He gave me a description of the woman and said she was on the next bus behind him and was to meet him in Fort Wayne. We waited for the next bus to come in, but no woman of that description was on the bus."

Deeds also testified: "About ten minutes elapsed from the time I reinitiated contact on the second occasion until defendant consented to the opening of the bag. None of the three of us used any force against defendant or made any threats or attempted to coerce him into giving me consent to speak with him or to search his luggage."

Testifying in his own behalf, defendant said: "On February 18, 1993, I was 17. Officer Deeds identified himself as a police officer and started asking questions. He took my bus ticket out of my inner coat pocket. He asked me some more questions, then let me go. I went to the bathroom and washed my face and came out. Deeds and Hicks approached me again and asked me to come

to the lounge. When I entered the lounge, the bag that I was traveling with was on the table and they started asking me questions. None of the officers told me I was free to leave, and I did not feel like I was free to leave. They didn't find my baggage claim ticket. Deeds told me to take off my shoes. I took off my right shoe and that's where they found it. They looked at the claim ticket number and the one that was on the bag and then asked me whether the bag was mine, and I claimed the bag. Deeds asked me if I would consent for the bag to be searched. It was after that point that I admitted that the bag was mine. Deeds still had not said I was under arrest. I gave him my permission to open the bag. I felt they already went through it so they were going to find it anyway, so why not just go ahead and give them consent to open the bag."

Fourth and Fourteenth Amendment principles governing the detention of a traveler and the seizure and search of his luggage at a transportation terminal are set forth in *Florida v. Bostick*, 501 U.S. 429, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991)—bus depot; *Florida v. Rodriguez*, 469 U.S. 1, 105 S.Ct. 308, 83 L.Ed.2d 165 (1984)—airport; *United States v. Place*, 462 U.S. 696, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983)—airport; *Florida v. Royer*, 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983)—airport; *Reid v. Georgia*, 448 U.S. 438, 100 S.Ct. 2752, 65 L.Ed.2d 890 (1980)—airport.

"Drug interdiction efforts have led to the use of police surveillance at airports, train stations, and bus depots. Law enforcement officers stationed at such locations routinely approach individuals, either randomly or because they suspect in some vague way that the individuals may be engaged in criminal activity, and ask them potentially incriminating questions." *Bostick*, 501 U.S. at 431, 111 S.Ct. at 2384.

"[T]he Fourth Amendment permits police officers to approach individuals at random in airport lobbies and other public places to ask them questions and to request consent to search their luggage, so long as a reasonable person would understand that he or she could refuse to cooperate." *Id.*

A seizure does not occur simply because a police officer approaches an individual and asks a few questions. So long as a reasonable person would feel free to disregard the police and go about his business, the encounter is consensual and no reasonable suspicion is required. The encounter will not trigger Fourth Amendment scrutiny unless it loses its consensual nature. A seizure does not occur unless the officer, by means of physical force or show of authority, has in some way restrained the liberty of a person. *Id.* at 434, 111 S.Ct. at 2386.

Even when an officer has no basis for suspecting a person, he may ask questions of that person, ask to examine his identification, and request consent to search his or her luggage, as long as the officer does not convey a message that compliance with his requests is required. *Id.*

A bus passenger's decision to cooperate with law enforcement officers authorizes the police to conduct a search without first obtaining a warrant *only* if the cooperation is voluntary. "Consent" that is the product of official intimidation or harassment is no consent. A citizen does not forfeit his constitutional rights when he is coerced to comply with a request which he would prefer to refuse. *Id.* at 437–39, 111 S.Ct. at 2388.

To determine whether a particular encounter constitutes a seizure of a person, a court must consider all the circumstances surrounding the encounter to determine whether the police conduct would have communicated to a reasonable person that the person was not free to decline the officer's requests or otherwise terminate the encounter. This rule applies to encounters which take place on a city street or in an airport lobby. *Id.* 439–41, 111 S.Ct. at 2389.

Certain constraints on personal liberty which are seizures for purposes of the Fourth Amendment may still be justified even though there is no showing of "probable cause," if there is "articulable suspicion that a person has committed or is about to commit a crime." Such a temporary detention for questioning is reviewed under the lesser standard enunciated in *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968),

and is permissible because of the public interest involved in the suppression of illegal transactions in drugs or of any other serious crime. *Florida v. Rodriguez*, 469 U.S. at 5, 105 S.Ct. at 310.

■ The Fourth and Fourteenth Amendments' prohibition of searches and seizures that are not supported by some objective justification governs all seizures of the person, including seizures that involve only a brief detention short of traditional arrest. *Reid*, 448 U.S. at 440, 100 S.Ct. at 2753.

Not all personal intercourse between policemen and citizens involves "seizures" of persons. A seizure occurs only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a person. *Id.* at 438–42, 100 S.Ct. at 2753–2754.

In some circumstances a person may be detained briefly, without probable cause to arrest him, but any curtailment of a person's liberty by the police must be supported at least by a reasonable and articulable suspicion that the person seized is engaged in criminal activity. A reasonable and articulable suspicion is something more than an inchoate and unparticularized suspicion or hunch. *Id.* at 441, 100 S.Ct. at 2754.

■ When an officer, after briefly detaining a traveler, gives back to him his ticket and driver's license and informs him that he is free to go if he so desires, the encounter generally is nothing other than a consensual matter "from start to finish." *Royer*, 460 U.S. at 504, 103 S.Ct. at 1328.

Reasons of safety and security may exist which would justify moving a traveler from one location to another during an investigatory detention, such as from an airport concourse to a more private area. *Id.* at 504–05, 103 S.Ct. at 1328.

There is no litmus-paper test for distinguishing a consensual encounter from a seizure or for determining when a seizure exceeds the bounds of an investigative stop. Even in the discrete category of airport encounters there will be endless variations in facts and circumstances, so much variation that it is unlikely that the court can reduce to a sentence or a paragraph a rule that will provide unarguable answers to the question whether there has been an unreasonable search or seizure in violation of the Fourth Amendment. *Id.* at 506–08, 103 S.Ct. at 1329.

■ Detentions may be "investigative" yet violative of the Fourth Amendment absent probable cause. In the name of investigating a person who is no more than suspected of criminal activity, the police may not carry out a full search of his person or of his automobile or other effects. The police may not seek to verify their suspicions by means that approach the conditions of arrest. *Id.* at 499, 103 S.Ct. at 1325.

■ Reasonable suspicion of a crime is insufficient to justify custodial interrogation even though the interrogation is investigative. An investigative detention must be temporary and last no longer than is necessary to effectuate the purposes of a stop. The investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time. The burden is on the state to demonstrate that the seizure it seeks to justify on the basis of a reasonable suspicion was sufficiently limited in scope and duration to satisfy the conditions of an investigative seizure. *Id.* at 1325–1326.

■ The Fourth Amendment does not prohibit a temporary detention of personal luggage for exposure to a trained narcotics detection dog on the basis of reasonable suspicion that the luggage contains narcotics. *Place*, 462 U.S. at 697–98, 103 S.Ct. at 2639.

■ In the context of personal property, and particularly containers, the Fourth Amendment challenge is typically to the subsequent search of the container rather than to its initial seizure by the authorities. In the ordinary case, a seizure of personal property is per se unreasonable within the meaning of the Fourth Amendment unless it is accomplished pursuant to a judicial warrant. Where officers have probable cause to believe that a container holds contraband or evidence of a crime, but have not secured a warrant, the Fourth Amendment permits seizure of the property, pending issuance of a

warrant to examine its contents, if the exigencies of the circumstances demand it or some other recognized exception to the warrant requirement is present. Under these circumstances, seizure of a suitcase may be justified but an immediate search, without a warrant, may violate the Fourth Amendment. *Id.* at 700–01, 103 S.Ct. at 2641.

■ Where there is a reasonable and articulable suspicion, based on objective facts, that luggage contains contraband or evidence of a crime, it is proper to make a warrantless seizure of luggage from the custody of the owner for the purpose of pursuing a limited course of investigation, short of opening the luggage, that would quickly confirm or dispel the suspicion. Where the nature and extent of the detention are minimally intrusive of the individual's Fourth Amendment interests, the opposing law enforcement interests can support a seizure based on less than probable cause. Where officers possess specific and articulable facts warranting a reasonable belief that a traveler's luggage contains narcotics, the governmental interest in seizing the luggage briefly to pursue further investigation is substantial. *Id.* at 702–03, 103 S.Ct. at 2642.

Because of the inherently transient nature of drug activity at airports, allowing police to make brief investigative stops of persons at airports on reasonable suspicion of drug trafficking substantially enhances the likelihood that police will be able to prevent the flow of narcotics into distribution channels. *Id.* at 704–05, 103 S.Ct. at 2643.

■ The intrusion on possessory interests occasioned by seizure of one's personal effects can vary in its nature and extent. Sometimes the seizure of the property is directly from the custody of the owner, and sometimes from a third party. Sometimes the investigation is confined to an on-the-spot inquiry, for example by exposure of luggage to a trained narcotics detection dog. Sometimes the property is transported to another place. Because seizures of property can vary in intrusiveness, some brief detentions of personal effects may be so minimally intrusive of Fourth Amendment interests that strong countervailing governmental interests will justify a seizure based only on specific articulable facts that the property contains contraband or evidence of a crime. *Id.* at 704–07, 103 S.Ct. at 2643–2644.

■ When an officer's observations lead him reasonably to believe that a traveler is carrying luggage that contains narcotics, the officer may properly detain the luggage briefly to investigate the circumstances that aroused his suspicion, provided that the investigative detention is properly limited in scope. *Id.* at 706–07, 103 S.Ct. at 2644.

■ A person possesses a privacy interest in the contents of personal luggage which is protected by the Fourth Amendment. Generally, the exposure of luggage, which was located in a public place, to a trained canine, does not constitute a "search" within the meaning of the Fourth Amendment. *Id.* at 706–09, 103 S.Ct. at 2644–2645.

■ When police seize luggage from the suspect's custody, the limitations applicable to the investigative detention of the person should define the permissible scope of an investigative detention of the person's luggage on less than probable cause. *Id.* at 707–09, 103 S.Ct. at 2645.

The length of detention of luggage alone may preclude the conclusion that the seizure was reasonable in the absence of probable cause. The brevity of the invasion of an individual's Fourth Amendment interests is an important factor in determining whether the seizure is so minimally intrusive as to be justifiable on reasonable suspicion. *Id.* at 707–11, 103 S.Ct. at 2645–2646.

Although the American Law Institute recommended a maximum of 20 minutes for a *Terry* -stop, the Supreme Court declined to adopt any outside time limitation. "Such a limit would undermine the equally important need to allow authorities to graduate their responses to the demands of any particular situation." *Id.* at 710 n. 10, 103 S.Ct. at 2646 n. 10.

If the events in the case at bar amounted to no more than a permissible police encounter in a public place, or a justifiable Terry-type detention, defendant's consent, if voluntary, would have been effective to legalize the search of his suitcase. *Royer,* 460 U.S. at 500–02, 103 S.Ct. at 1326.

If, under all the circumstances of this case, the seizure of defendant's luggage was un-

reasonable under the Fourth Amendment, evidence obtained from the subsequent search of his luggage was inadmissible and his conviction must be reversed. *Place,* 462 U.S. at 710–11, 103 S.Ct. at 2646.

 The first encounter between Officer Deeds and defendant lasted only two minutes. Deeds identified himself, showed defendant his badge, and got defendant's permission to speak with him. Deeds said that defendant's race was not a factor which led him to initiate the encounter. Although a pat-down search was conducted by Deeds during this encounter, defendant consented to that search. At the end of this encounter, Deeds returned the bus ticket to defendant, and Deeds walked away. Defendant said that Deeds "let me go." This encounter did not invade defendant's constitutional rights. *Royer,* 460 U.S. at 504–05, 103 S.Ct. at 1328.

Meanwhile, Officer Hicks had located one suitcase, ticketed from Los Angeles to Fort Wayne, which bore no identification tag. Defendant was the only passenger ticketed from Los Angeles to Fort Wayne. Hicks gave this information to Deeds, who initiated the second encounter.

 The second encounter lasted only ten minutes. At its inception, Deeds told defendant he was not under arrest and was free to go. Defendant consented to go into the nearby drivers' lounge. Inside the lounge, Deeds again told defendant he was free to go. Officer Hicks testified that at that point he would not have let defendant take the suitcase. Defendant was still denying ownership of the suitcase.

Deeds asked defendant to empty his pockets, and defendant consented to doing so. Deeds then informed defendant that he did not have to remove his shoes to permit a search for the missing identification tag. Defendant stated that he wanted to do so.

After the tag was discovered in defendant's shoe, he was given the Miranda warnings. Thereafter, Deeds asked defendant for permission to search the suitcase, but told defendant he did not have to consent to the search. Defendant admitted that he was so informed. The officers testified that at no time were any threats made or coercion applied.

With respect to the search of the suitcase by the officers, no search was made until after defendant had consented to it. "The Fourth Amendment ... merely proscribes those [searches] which are unreasonable. Thus, we have long approved consensual searches because it is no doubt reasonable for the police to conduct a search once they have been permitted to do so." *Florida v. Jimeno,* 500 U.S. 248, 249–51, 111 S.Ct. 1801, 1803, 114 L.Ed.2d 297 (1991) (citation omitted). *See State v. Hyland,* 840 S.W.2d 219, 221–222 (Mo. banc 1992).

This court holds that the evidence was sufficient to support the trial court's denial of the motion to suppress.

The judgment is affirmed.

SHRUM, C.J., and MONTGOMERY, J., concur.