STATE of Missouri, Plaintiff–
Respondent,

v.

Jeremy PAYNE, Defendant–Appellant.

No. 25498.

Missouri Court of Appeals,
Southern District,
Division One.

Feb. 9, 2004.

Irene Karns, Columbia, for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Richard A. Starnes, Asst. Atty. Gen., Jefferson City, for Respondent.

JAMES K. PREWITT, Judge.

Following jury trial, Jeremy Payne ("Defendant") was convicted of murder in the first degree, in violation of § 565.020, RSMo 1994, and sentenced to life imprisonment without eligibility for probation or parole. With four points relied on, Defendant contends that the trial court erred in denying a motion to suppress Defendant's videotaped statement, abused its discretion in refusing to admit a written statement of a witness and limiting the cross-examination of that same witness, and plainly erred in permitting the State to urge jurors during closing argument to try to imagine how the victim must have felt while being killed.

## Facts

Defendant does not challenge the sufficiency of the evidence. Viewed in the light most favorable to the verdict, the following evidence was adduced at trial. Diane Coleman ("Diane") suffered from schizophrenia and lived at the Westwood Care Center ("Westwood") in Crawford County, Missouri, so that she could receive close supervision regarding her medication. Although Diane was allowed the freedom to come and go from Westwood, she would return throughout the day to take her medication and was often back at Westwood by the evening meal. She was allowed to stay out overnight, but she rarely did so.[1]

Diane spent time with Richard Payne, Defendant's father. They were "sexually involved." Diane had visited Richard at his or his mother's home, and the two had also gone out to eat together on occasion, after which Richard would return Diane to Westwood. Richard and his children, including Defendant, had also visited Diane at Westwood, and the group had gone swimming in the center's pool.

Diane's mother, Peggy Coleman, spoke to Diane every day by telephone and last spoke with her at approximately 10:30 a.m. on November 11, 1997. Peggy tried to call Diane at Westwood later that day and into the evening, but could not reach her. Diane was last seen at Westwood sometime between 8:00 and 8:30 a.m. on November 11th.

Sometime after 11:30 p.m. on November 11, 1997, eleven year old Kenneth Paul Busse, Jr. ("Kenny"), who lived at the home of his grandmother, was visited by his sister Amanda, who is also known as Mandy. She encouraged Kenny to go out

---

1. For simplicity's sake, we will refer to Diane Coleman and others in the case by their first names. We mean no disrespect.

with her and a group of friends to celebrate his twelfth birthday, which she was going to miss and which was ten days away.

Kenny went with the group that, in addition to Amanda, included Amanda's husband Larry DeClue, Defendant, Angela Cody, and Melissa O'Brien. The group was in a van owned by Kenny's father, and Larry was driving. At some point, Amanda gave Kenny a strip of the drug LSD; he put it in his mouth for only a couple of seconds.

Kenny fell asleep and when he awoke, he was alone in the van. He exited the van and saw the others standing in a circle around Diane, who was lying on the ground. As Kenny asked his sister what was happening, Larry went to the van and returned with a souvenir baseball bat and a pipe cutter. Larry then informed the group "that everybody was going to hit [Diane] so that nobody could say nothing to nobody."

Larry was the first to strike Diane, and then others in the group, including Defendant, hit her as well. Diane tried to protect herself from the blows and whenever she attempted to say something, it sounded gargled. Kenny was told to hit Diane, but he ran back to the van.

Once in the van, Kenny saw Larry and Defendant throw Diane's body over a bridge. Diane's foot became stuck in a branch and as Larry was trying to untangle it, a car pulled up and an occupant asked if she could help with anything. Defendant pretended to vomit and Amanda told the person in the car that Defendant had drank too much and was ill. The group then came back to the van and Larry told Kenny that if Kenny "said anything, [Larry'd] take care of it."

The next day, Larry and Defendant picked up Kenny at Kenny's grandmother's home and the three went back to the bridge, retrieved Diane's body, and placed the body, covered by a tarp, in the back of Larry's truck. Once they arrived at Larry's cabin, Larry told Kenny to wait there, and Larry and Defendant left in the truck and went into the woods. Larry returned an hour or so later. Defendant was not with him, but one of Kenny's uncles did return with Larry. Larry asked Kenny to get a bucket and some water, and, while Kenny stayed in the cabin, Larry and Kenny's uncle "scrubb[ed] the truck down" and "burn[ed] the liner." After they finished cleaning the truck, they took Kenny back to his grandmother's house.

Diane's body was discovered on November 15, 1997, in an area of the Meramec River called the "fish trap." Based on the condition of the body, it was determined that Diane had been dead at least twenty-four hours. She had received multiple blows from a blunt object or objects, and the injuries from the blows, which included a laceration at the base of the brain stem that separated the brain from the spinal cord, caused her death. Diane also had numerous injuries consistent with self defense-type wounds, which indicated she was attempting to protect herself. Diane's death was ruled a homicide.

Sometime after the murder, Defendant had a conversation with Candace Barton in which he told her that "they were tripping on acid, and they thought [Diane] was a mailbox . . . . [a]nd they hit her." Defendant also told Candace that "they took [Diane] to the river and beat her to death."

On November 21, 1997, Darren Dake and Mike Greeley, detectives with the Crawford County Sheriff's department, contacted Defendant, who voluntarily accompanied them to the police station. Defendant was informed that the detectives were interested in talking to him regarding his knowledge of the case involving

Diane's death. Defendant was not placed under arrest, but was read his Miranda rights by Detective Greeley after being placed into a vehicle for the trip to the station.[2]

Once at the station, Defendant was again advised of his Miranda rights prior to questioning by the detectives. Defendant initially denied any knowledge of Diane's murder, but later gave details that led the detectives "to believe that [Defendant] was directly involved." The detectives determined that a more extensive, and recorded, interview was necessary, so they proceeded to videotape their interview with Defendant.

At the beginning of the videotaped interview, Defendant was advised again of his Miranda rights and he indicated that he understood the rights. Defendant is seen signing a form waiving his rights. Within the videotaped interview, Defendant provided details and information that the police had not yet discovered, but that were found to be true after further investigation.

Defendant was charged with one count of murder in the second degree, in violation of § 565.021, RSMo 1994, and one count of armed criminal action, in violation of § 571.015, RSMo 1994, after which the venue was changed from Crawford County to Phelps County. On July 20, 1999, following a hearing on the matter, Defendant's motion to suppress his statements was sustained based on the court's finding that Defendant's mental capacity was below normal and that the detectives failed to make efforts

to assure the reviewing judge 1) that the information given to [Defendant] concerning his constitutional rights ade-

quately advised him as to the existence and nature of those rights, and the consequences of asserting or waiving such rights, and 2) thereafter, [Defendant] demonstrates a clear understanding of those rights and consequences.

The State dismissed the charges on July 26.1999.

On August 8, 2000, Defendant was charged with murder in the first degree, in violation of § 565.020, RSMo 1994. In October 2000, the venue was changed from Crawford County to Pulaski County. A hearing was held on Defendant's motion to suppress his statements on September 24, 2002. The judge hearing the motion, who was not the same judge that heard a similar motion in the first set of proceedings, denied the motion on October 29, 2002. In its order, the court first noted that it was not bound by the decision in the first case and then found that Defendant was advised of his Miranda rights on multiple occasions, "appeared to be reading along as the rights were explained, and signed the waiver form." The judge further stated that Defendant "indicated his understanding of his rights on the [video]tape."

According to the judge's order, although two psychologists testified at the motion hearing that, based on the tests they administered to Defendant, "they would not have expected Defendant to understand," the tape showed that Defendant did understand and the expert witnesses were unable to "point[ ] to any area of the tape which indicated [Defendant's] lack of understanding." Under the totality of the circumstances, the judge determined that Defendant's waiver of his Miranda rights "was knowing, intelligent and voluntary, and no coercion or other undue influence was used in obtaining the statement."

---

**2.** Miranda rights are those referenced under *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

The case proceeded to trial and the jury found Defendant guilty of murder in the first degree. He was sentenced to life imprisonment without the possibility of probation or parole. This appeal followed.

## Discussion

Defendant raises four points on appeal. Additional facts necessary to the disposition of the case are included below as we address each of Defendant's points.

*Point I: Denial of Motion to Suppress and Admission of Defendant's Videotaped Statement*

 In his first point, Defendant argues that the trial court erred in denying his motion to suppress and in admitting his videotaped statement and testimony related to it. According to Defendant, his "waiver of the right to remain silent was neither knowing nor intelligent in that, due to cognitive and communicative deficits, he did not comprehend the rights or understand how to exercise them."

 Before continuing, we address any argument Defendant may rely on regarding the effect of the judge sustaining his motion to suppress when he was initially charged with murder in the second degree and armed criminal action, charges that were later dismissed by the State. A ruling on a motion to suppress prior to trial is interlocutory in nature and not binding on any future proceedings. *State v. Hughes,* 899 S.W.2d 92, 95 (Mo.App. 1994). Thus, the judge who heard the motion during the proceedings at issue here was not bound by the determination in the first set of proceedings. *See id.*

Returning to our review of the denial of Defendant's motion to suppress that is the focus of Defendant's Point I, we note that appellate review of such motions is limited to a determination of whether sufficient evidence exists to sustain a trial court's

holding. *State v. Floyd,* 18 S.W.3d 126, 131 (Mo.App.2000).

 Waivers of Miranda rights "must not only be voluntary, but must also constitute a knowing and intelligent relinquishment or abandonment of a known right or privilege, a matter which depends in each case upon the particular facts and circumstances surrounding that case, including the background, experience and conduct of the accused." *State v. Walton,* 899 S.W.2d 915, 920 (Mo.App.1995) (internal quotations and citations omitted). To determine whether a waiver is voluntary, the test is whether the totality of the circumstances show that a defendant was deprived of a free choice to admit, deny, or refuse to answer, and whether physical or psychological coercion was such that a defendant's will was overborne when he or she confessed. *Floyd,* 18 S.W.3d at 132. If a defendant is informed of the right to remain silent under *Miranda,* understands that right, and thereafter makes voluntary statements, "it is absurd to say that such a person has not made a knowing and intelligent waiver of [the] right to remain silent." *Walton,* 899 S.W.2d at 920–21 (quoting *State v. Schnick,* 819 S.W.2d 330, 336 (Mo. banc 1991)).

In the case before us, the judge hearing the motion to suppress took judicial notice of the testimony from the first hearing, to the extent that the doctors who testified were available for cross-examination at the second hearing.

Detective Greeley testified at the first hearing. He testified that Defendant, when read his Miranda rights, appeared to understand the rights as they were being read to him. According to Greeley, Defendant never appeared to have trouble understanding either the rights he was waiving or the questions he was asked. Defendant never seemed confused and

there were no "obvious signs of impairment."

Defendant signed a written waiver of his rights at the beginning of the videotaped statement. As Defendant was read his Miranda rights on the videotape, Greeley stopped after reading each of the rights to ask Defendant whether he understood the right. Greeley also testified that neither he nor Detective Dake yelled at Defendant or threatened him in any way during the interrogation.

Detective Dake testified at both the first and second hearings. Dake testified that Defendant was read his Miranda rights prior to being taken to the police station, once at the police station, and at the beginning of the videotape. Defendant signed two forms waiving his Miranda rights, one after being advised of his rights upon arriving at the police station and another as the videotape began.

Dake testified that there was nothing in Defendant's actions or words to lead the detective to believe that Defendant was having difficulty understanding and Defendant gave "appropriate responses" to statements and questions from the detectives. Defendant affirmatively told the detectives he understood. Dake also testified that Defendant was never threatened before or during the interrogation, nor were there any promises of leniency made.

Dr. Michael Stacy, a licensed psychologist, testified at the first and second hearings. Dr. Stacy testified that Defendant has mild mental retardation. Dr. Stacy administered a test to Defendant to evaluate Defendant's understanding of Miranda warnings. In Dr. Stacy's opinion, "merely reading the Miranda form to [Defendant] . . . . would not be sufficient to assure that he understood." According to Dr. Stacy, someone of Defendant's level of function often answers yes to a question when the answer is actually no or I don't know; to appropriately determine what such a person understands, he or she needs to be asked to explain or paraphrase what is being asked. On the first part of the test Dr. Stacy administered to Defendant, Defendant "[d]id very well" and correctly gave appropriate meanings for each of the Miranda warnings.

Dr. Patricia Carter, also a licensed psychologist, testified at the second hearing. Dr. Carter diagnosed Defendant with "mild mental retardation, cannabis abuse, a reading disorder, and . . . could not rule out receptive expressive language disorder."

In her evaluation of Defendant, Dr. Carter asked Defendant a series of questions to gauge whether he "was competent to proceed in legal matters[,]" including his level of "understanding of legal matters." Dr. Carter's opinion was that Defendant was not competent to participate in legal proceedings. She found Defendant could "often . . . be suggestible or acquiescent to other people."

When she viewed the videotape, Dr. Carter determined that Defendant exhibited the behaviors referenced above with the detectives. However, when asked by the State to identify specific portions of the tape in which Defendant's behavior was indicative of suggestibility, Dr. Carter was unable to do so.

According to Dr. Carter's report, Defendant was able to give at least simplistic explanations of terms associated with legal proceedings, such as the distinction between first and second degree murder, and the difference between being guilty and innocent or of having an alibi. She also saw no signs of "psychiatric impairment" during her evaluation of Defendant.

Given the totality of circumstances, we find that there was sufficient evidence before the judge in the second hearing to

support the court's denial of Defendant's motion to suppress. Point I is denied.

*Point II: Exclusion of Kenny's March 6, 2000 Written Statement*

In his second point, Defendant contends that the trial court abused its discretion in refusing to admit into evidence Kenny's written statement of March 6, 2000. According to Defendant, the exclusion of this evidence denied him the opportunity to impeach Kenny.

■ The trial court is vested with broad discretion in the admission or exclusion of evidence. *State v. Seiter*, 949 S.W.2d 218, 222–23 (Mo.App.1997). This discretion includes the duty to determine the relevance, materiality, and remoteness of the proffered impeachment evidence. *State v. Gee*, 822 S.W.2d 892, 895 (Mo.App.1991). We will not disturb the trial court's ruling on appeal absent a clear abuse of its discretion. *Seiter*, 949 S.W.2d at 223. The above standard is recognized and applied in the case of cross-examination in collateral issues for the purposes of impeachment. *State v. Hester*, 829 S.W.2d 106, 109 (Mo. App.1992). We review for prejudice and not mere error; thus, we will affirm the trial court's ruling unless it was so prejudicial as to deprive Defendant of a fair trial. *State v. Charlton*, 114 S.W.3d 378, 383 (Mo.App.2003).

Kenny testified at trial that he was with his sister Amanda, her husband Larry, Defendant, and two others when he witnessed them beat Diane, and Defendant and Larry throw her body over the bridge. Kenny also testified that he was with Defendant and Larry when they retrieved the body and then waited at Larry's cabin while Defendant and Larry took the body elsewhere.

In his testimony, Kenny acknowledged that, when the police initially talked to him, he denied any knowledge of the mur-der. According to Kenny, he was scared of Larry because he "had full access to me any time he wanted to be with me. Any time [Larry] wanted to see me, he knew exactly where I was." Kenny also had loyalty toward and loved Amanda. After a conversation with his aunt, Kenny did talk with authorities, and "started telling them the story, ... got scared, and then ... started lying about it." According to Kenny, Larry was in jail by that time, but Kenny was still scared, "thinking about if [Larry] ever did get out." Kenny continued to be scared of Larry, even at the time of trial.

In addition to the time referenced above, Kenny spoke with authorities on other occasions, and reached a point where he "tried to get out of all of this, to take it all back .... [because he] didn't want to be involved in it." Larry's threat that Kenny should not tell anyone about what happened because, if he did, "Larry said he would take care of it[,]" affected Kenny's statements to the police. Kenny testified that his motive for finally telling the truth was to not get into trouble so that his brother might be able to come stay with Kenny at his aunt's house, with whom Kenny lived after getting "kicked out" of his grandmother's home.

On cross-examination, Kenny was asked about various inconsistencies in his statements, including those made to police in a tape-recorded statement September 6, 2000, at a preliminary hearing in September of 2000, a deposition in September of 2002, and at trial. Included were Kenny's statements at the preliminary hearing in which Kenny stated that he saw Larry and Amanda hit Diane repeatedly, and how Kenny described the manner in which the body was transported to the bridge (which persons held which parts of Diane's body), and the condition or whether Diane's body was clothed when retrieved the next day.

Kenny was also cross-examined regarding his statements at trial that Defendant hit Diane, but that in the tape-recorded interview on September 6, 2000, at the sheriff's department, when Kenny was asked whether Defendant hit or kicked Diane, Kenny responded no.

During the cross-examination, Kenny testified that he did not remember making some of the earlier statements during interviews with police or at the preliminary hearing, because he had suffered a concussion since making those statements.

Kenny was also asked about talking to the police prior to September 2000, when law enforcement officials from the Crawford County Sheriff's Department came to talk to Kenny on March 6, 2000. Defense counsel asked Kenny if he had made a statement on that day that he "had been at [his] sister's house and overheard [Larry] and [Amanda] talking to a friend about the Diane Coleman murder." Kenny responded, "I'm not sure." Kenny clarified that he remembered talking to police that day, but that he didn't "remember what about." Defense counsel then asked, "You told them, Larry said he was riding down the road and hit Diane Coleman?" Before Kenny could answer, the State made a hearsay objection and asked, "If it doesn't relate to a statement made by this Defendant, how is that admissible and relevant?" The trial court sustained the objection.

A lengthy bench conference ensued regarding whether questioning Kenny about these statements was proper, for impeachment purposes or otherwise. Defense counsel argued it was proper impeachment because Kenny, in March of 2000, told a story about overhearing Larry and Amanda talk about the murder and their involvement in it, but Kenny did not mention Defendant's presence or involvement, whereas, at trial, Kenny testified that he

was present at the murder and that Defendant was also present and involved.

The trial court allowed defense counsel to use an exhibit that purported to be a written statement from Kenny taken on March 6, 2000 "to see if that refreshes his memory." As questioning continued, Kenny acknowledged the date, that the document was in his handwriting, and that it contained his signature. Kenny, however, indicated that he did not remember writing the statement. Defense counsel attempted to inquire further regarding the statement, but the State renewed its objection, and a bench conference was held outside of the presence of the jury.

Defense counsel offered the written statement as an exhibit. The trial court determined that, although defense counsel could get past "the authenticity of [the document]" by Kenny's acknowledgement of its creation, the document was not admissible.

Defense counsel was allowed to make an offer of proof. Defense counsel argued that the statement showed that Kenny implicated Larry, of whom Kenny was supposedly terrified, at a time when Larry was not incarcerated. The trial court's response to that argument was that defense counsel could ask Kenny whether he was terrified of Larry, but could not use the statement as "an admission from a third party to this action in this trial." Defense counsel stated that he was not offering the statement for the truth but, rather, to show that Kenny used an opportunity to write a statement detailing his knowledge of the murder, a statement that differed from Kenny's trial testimony. Therefore, according to defense counsel, he should be allowed to use the statement to impeach Kenny's credibility regarding his fear of Larry and the relationship of that fear to whether Larry was incarcerated or not.

The trial court sustained the State's objection to the substance of the statement coming in as evidence as "it contain[ed] information that is now not subject to purview by this jury." The court reiterated that the document, the written statement dated March 6, 2000, was not admissible.

Cross-examination resumed with defense counsel asking Kenny about the questioning by sheriff's department officials on March 6, 2000, and whether an officer had asked Kenny whether he had information on Diane's murder. Kenny responded that he could not remember what he told the officers. As for whether Kenny told the officers if he was or was not present at the murder, Kenny stated he did not know what he said in that regard because that information was not in the written statement that he had just read (in an attempt to refresh his memory). According to Kenny, "I might not have wrote [sic] it on the paper, but I might have told them. I don't know."

The State objected when defense counsel asked, "You didn't tell them that [Defendant] was there?" and again when defense counsel asked, "When these officers talked to you, did you tell them that [Defendant] was present when [Diane] was killed?" The trial court sustained the first objection, but did not respond to the second objection, and Kenny's response to the second question was, "I just answered that. I said I don't remember."

Defense counsel's questions then turned to a time when Kenny was interviewed in October 2000, after the preliminary hearing. Kenny testified he remembered the interview as he was residing then at the Division of Youth Services ("DYS") in Cabool, Missouri, but could not recall what he said during the interview. Kenny again referenced his concussion that occurred on New Year's Eve of either 2001 or 2002.

A letter Kenny wrote in December 2000, while he was staying at DYS, was admitted into evidence. Kenny verified the letter was in his handwriting and contained his signature. When asked if he had a chance to read the letter, Kenny indicated that he knew what it said. Within the letter, Kenny declared, "The statement I made about the murder was and is completely untrue. The reason I lied is because I wanted to clear my father's name."

Defense counsel then asked Kenny about a conversation he had with the State on the date of a scheduled deposition in September 2002. Kenny agreed with defense counsel's characterization of this conversation—that Kenny had informed the prosecutor that he had lied at the preliminary hearing in September 2000. Kenny testified that he later met with representatives from the Attorney General's Office, who talked to him about perjury and told him that "they already had [Kenny] on one or two counts of perjury .... [and that Kenny] would go to prison for perjury." Kenny testified that he had not been threatened with regard to his testimony at trial.

On re-direct, Kenny testified that he had not been threatened in any way by the prosecutor in that conversation during September 2002. Kenny also indicated that, rather than having informed the prosecutor that he had lied, he told the prosecutor that he had not told the State everything, that he "didn't complete the story." As for the contents of the December 2000 letter, Kenny testified that, "I heard that my ... dad's name was coming up and I didn't want him involved, because it wasn't him, .... [a]nd I didn't want my dad involved, and I didn't want to get my sister in trouble. I was too scared to face Larry."

■ Regarding Defendant's contention that the trial court abused its discretion by

refusing to admit Kenny's March 6, 2000 written statement into evidence, we find that there was no abuse of discretion. Recall that we review for both error and prejudice, and will affirm the trial court's ruling unless it was so prejudicial as to deprive Defendant of a fair trial. *Charlton*, 114 S.W.3d at 383.

■ There was discussion at trial of utilizing the writing to refresh Kenny's memory. Under that theory, a witness may refresh his recollection by a writing prepared by him, or known by him to be correct, if the foundation is laid that the witness exhibits both a lack of present memory and requires the writing for recall. *State ex rel. Pini v. Moreland*, 686 S.W.2d 499, 502 (Mo.App.1984). However, assuming the witness' memory is refreshed, the writing itself is not introduced into evidence or shown to the jury; rather, the witness' independent recollection, and not the writing, is the evidence allowed before the jury. *State v. Hicklin*, 969 S.W.2d 303, 309 (Mo.App.1998).

■ Here, the portions of trial outlined above show that Kenny's memory was not refreshed by the writing. Under such circumstances, it is possible for the writing to be admitted into evidence as past recollection recorded. *State v. Patton*, 255 Mo. 245, 164 S.W. 223, 226 (1914). In that situation,

> the witness speaks from a record made by him, or from one which, when it was made, he knew to be a true and correct recital of facts, but of which, when he testified, he had no independent present recollection, and regarding which he remembers only that, when the record shown him was made, it was correct. In effect, in lieu of his own testimony, he introduces a witness, and merely vouches for that witness' veracity. In such case the paper, writing, or instrument so identified—that is, the witness vouched

for—is itself competent as evidence, and may be offered. *Id.*

Kenny, however, was unable to verify that the March 6, 2000 writing was correct, as indicated by his response to questions regarding the written statement including, "I might not have wrote [sic] it on the paper, but I might have told them. I don't know." Thus, the document could not have been admitted under the past recollection recorded exemption to the hearsay rule. *See Chevalier v. Dir. of Revenue*, 928 S.W.2d 388, 395 (Mo.App.1996).

■ Defendant's main argument here is that the trial court's refusal to admit the writing into evidence prejudicially impaired his right to impeach Kenny. A defendant has the right to impeach a witness with a prior inconsistent statement. *See Hicklin*, 969 S.W.2d at 309. In particular, under § 491.074, RSMo 1994, in a prosecution under chapter 565, a witness' prior inconsistent statement shall be received as substantive evidence and the party offering the statement may argue the truth of that statement. *Id.* Such statements, if a proper foundation is laid for them, fall within the hearsay exemption for prior inconsistent statements. *State v. Archuleta*, 955 S.W.2d 12, 16 (Mo.App.1997).

Here, given the volume of testimony shown above regarding Kenny's various inconsistent statements to the police throughout the investigation and preliminary proceedings, we need not decide if it was error for the trial court to refuse to admit into evidence Kenny's written statement from March 6, 2000. There was ample evidence before the jury for it to take into consideration how Kenny's story may have changed over time and whether previous statements were in conflict with his testimony at trial. The trial court's ruling did not result in prejudice toward Defendant.

Point II is denied.

*Point III: Cross-examination of Kenny regarding Knowledge of Father's Incarceration*

In his third point, Defendant contends that the trial court abused its discretion by not allowing Defendant to cross-examine Kenny about knowledge that Kenny's father, known as Busse Sr., was charged and incarcerated in connection with Diane's murder early in 1997 or early 1998. According to Defendant, the ruling denied him the opportunity to impeach Kenny's credibility with information that contradicted one of Kenny's reasons for writing the December 2000 letter, which was to keep Busse Sr. from getting into trouble. By the time of the writing of that letter, Busse Sr. had been charged and incarcerated in connection with the murder.

The trial court has broad discretion in determining the permissible scope of cross-examination. *State v. Mayes*, 63 S.W.3d 615, 629 (Mo.banc 2001). Cross-examination is used to test the accuracy, veracity, and credibility of a witness, and therefore, cross-examination is not necessarily limited to those issues that tend to prove the issues at trial. *State v. Gardner*, 8 S.W.3d 66, 72 (Mo.banc 1999). However, trial judges are permitted wide latitude to impose reasonable limits on cross-examination to address concerns of prejudice, confusion of the issues, and questioning that is only marginally relevant. *State v. Mann*, 23 S.W.3d 824, 835 (Mo.App.2000). A trial court's exclusion of an offer of impeachment on an immaterial or collateral matter does not constitute an abuse of discretion. *Id.*

A defendant has the right to cross-examine his accusers, but that right is not without limitation. *State v. Guinn*, 58 S.W.3d 538, 547 (Mo.App.2001). The opportunity for effective cross-examination does not necessarily include "cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Id.* (internal quotations and citations omitted). As with Point II, we review for prejudice and not mere error; and will affirm the trial court's ruling unless it was so prejudicial as to deprive Defendant of a fair trial. *Charlton*, 114 S.W.3d at 383.

The December 2000 letter was admitted into evidence during Kenny's cross-examination. Within the letter, Kenny declared, "The statement I made about the murder was and is completely untrue. The reason I lied is because I wanted to clear my father's name." On re-direct, Kenny indicated that he was "trying to ... take things back and not testify against [his] sister or anybody." Kenny further testified on re-direct regarding his motive for writing the letter, "I heard that my ... dad's name was coming up and I didn't want him involved, because it wasn't him, .... [a]nd I didn't want my dad involved, and I didn't want to get my sister in trouble. I was too scared to face Larry."

On re-cross, defense counsel attempted to ask Kenny about Busse Sr. being arrested in connection with Diane's murder much earlier than December 2000. During a bench conference following the State's objection, it was noted that Busse Sr. had been arrested and charged shortly after the murder occurred, but had been discharged by the time of Kenny's letter. Defense counsel asserted that in a deposition, Kenny had testified that he was aware of Busse Sr.'s earlier arrest. Defense counsel therefore, wanted to inquire as to why Kenny did not write such a letter back in 1997 when his father had been charged and incarcerated. The trial court sustained the State's relevancy objection.

An offer of proof was made later. Kenny stated that he wrote the letter for the reasons given during cross and re-direct,

that he heard, from Busse Sr., that Busse Sr. was being implicated and Kenny did not want his father involved. Kenny was asked about his deposition testimony in September 2002, in which Kenny stated that he had heard Busse Sr. was involved in the murder, shortly after the murder occurred, because someone at school was showing a newspaper with Busse Sr.'s picture on it. Kenny also stated during that deposition testimony that he thought at that time that Busse Sr. had been arrested for something, but it was not until the girl brought the newspaper to school that Kenny realized his father had been arrested for Diane's murder.

During the offer of proof, Kenny testified that he remembered the deposition, but did not "remember the school thing." Kenny acknowledged that he was aware back in November or December of 1997 that his father had been arrested for something, "but nobody told me for what." The trial court rejected the offer of proof.

█ A defendant's right to confrontation is not impinged if the defendant has the opportunity to cross-examine and elicit testimony on matters such as a witness' bias. *State v. Dixon,* 922 S.W.2d 75, 77 (Mo.App.1996). Given the cross-examination testimony detailed within Point II, we find that Defendant's right to confrontation here was not prejudicially impinged. There was ample testimony elicited regarding Kenny's contradictory or inconsistent statements to allow the jury to determine Kenny's credibility.

Point III is denied.

*Point IV: Plain Error during Closing Argument*

█ In his final point, Defendant argues that the trial court plainly erred by allowing the State, during closing argument, "to urge the jurors to imagine how Diane must have felt while being killed." Defendant acknowledges that no objections were made to the statements.

█ Allegedly improper statements made by the State during closing argument that are not preserved by a timely objection can only be reviewed for plain error under Rule 30.20. *State v. Anderson,* 79 S.W.3d 420, 439 (Mo.banc 2002). Alleged errors committed in closing argument justify relief under the plain error rule only if they are determined to have a decisive effect on the jury, and if there was a reasonable probability that, in absence of the statements, the verdict would have been different. *State v. Faulkner,* 103 S.W.3d 346, 362 (Mo.App.2003). Statements made in closing argument rarely result in plain error. *Anderson,* 79 S.W.3d at 439.

During the initial phase of closing argument, as the prosecutor discussed the injuries Diane received, the transcript reflects he stated:

> If you can feel an [sic] imagine what went through [Diane's] mind as she lay there and they just beat her again and again. That kind of death, that kind of treatment demands, screams for the ultimate punishment.

Later, during the rebuttal phase, the prosecutor made these statements:

> And, you know, ladies and gentlemen, you look at [Defendant's] face in this environment, just a young man. But I want you to imagine for a minute the way his face looked to Diane Colemen while she lay on the ground and looked up and tried to scream and she couldn't. The scream was caught in her throat.
>
> I want you to imagine how his face looked to her, and I want you to imagine the horror of the last few minutes of her life that these people stood around her and hit her, and hit her, and hit her and she died. That's not something nice to think about, not so pleasant to think about, but it's hard to imagine that another human being—that one human be-

ing could do that to another. Who did? [Defendant] did (indicating).

Defendant argues that the prosecutor's statements amounted to improper personalization. A prosecutor is allowed, during closing argument, to argue general propositions regarding the prevalence of crime in the community, the personal safety of the community's citizens, and the jury's duty to uphold the law including references regarding the jury's failure to convict and pleas to the jury's common experience. *State v. Bristol,* 98 S.W.3d 107, 115 (Mo.App.2003). Improper personalization occurs when the statements during closing argument suggest a personal danger to the jurors or their families. *Id.*

Defendant asserts that, through these statements, the prosecutor "urged the jurors to put themselves in [Diane's] place." We agree that, had the prosecutor done so, the statements might well have been improper personalization, as asking jurors to imagine themselves the victims in a detailed recitation of the crime has been deemed improper personalization. *See State v. Norton,* 949 S.W.2d 672, 678 (Mo. App.1997).

Here, however, the prosecutor did not ask the jurors to place themselves in the shoes of the victim, nor did he suggest any personal danger to the jurors or their families, at least not to the point of prejudicing Defendant. *See State v. Williams,* 97 S.W.3d 462, 474 (Mo.banc 2003). No plain error occurred. Point IV is denied.

## Conclusion

The judgment is affirmed.

BARNEY, P.J., and GARRISON, J., concur.