**STATE of Missouri, Plaintiff–Respondent,**

v.

**Richard Dean FLOYD, Defendant–Appellant.**

No. 22598.

Missouri Court of Appeals,
Southern District,
Division Two.

May 2, 2000.

Rehearing and Application for Transfer Denied May 24, 2000.

Application for Transfer Denied June 27, 2000.

Amy M. Bartholow, Asst. Public Defender, Columbia, for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Linda Lemke, Asst. Atty. Gen., Jefferson City, for respondent.

JAMES K. PREWITT, Judge.

Defendant was arrested the morning of October 3, 1997, for the murder of his wife. He was originally charged by complaint, which was dismissed when the grand jury issued an indictment on October 28, 1997, charging murder in the first degree, pursuant to § 565.020.1, RSMo 1994. Following jury trial on August 24–28, 1998, Defendant was found guilty and thereafter sentenced to life imprisonment without parole.

The evidence presented established the following: At approximately 4:00 a.m. on October 3, 1997, Defendant awoke before his wife, Sherri Floyd, and turned off the alarm clock so that she would not be awakened by it. Defendant retrieved a butcher knife from the kitchen and returned to bed, where he laid down next to his wife for an hour and thought about killing her. When Sherri began to wake, Defendant attempted to plunge the knife into her stomach. The knife did not penetrate her stomach, so Defendant straddled his wife and began slashing at her throat and legs with the knife. Sherri struggled and screamed, and Defendant continued to attack her. Finally, Defendant put his hands around Sherri's neck and squeezed until she stopped struggling. When Defendant relaxed, Sherri gasped and began moving, and Defendant again strangled her, this time fatally. Defendant then

checked her for a pulse, and found none. After that, Defendant washed his hands in the bathroom, and went into the kitchen to eat a bowl of cereal. When he finished eating, Defendant went back into the bedroom and checked again for a pulse. Defendant then called his father-in-law, Charles Mears, and told him that he had just killed Charles' daughter. Defendant also called 911 and said, "I've just killed my wife."

When police officers arrived at Defendant's home, Defendant walked outside with his hands raised. When the officers instructed him to lie down on the ground, he complied. Defendant was handcuffed, placed in the back of a patrol car, and read his *Miranda* rights. Detective James Arnott arrived at the scene, and again read Appellant his *Miranda* rights and transported him to the Sheriff's station.[1]

For several years prior to his wife's death, Defendant had been suffering with depression. On January 6, 1995, Appellant's co-workers found him dazed and disoriented, and wandering in the parking lot. A co-worker brought him inside, and attempted to talk to him. Defendant's eyes were glazed; he was hallucinating and hearing voices. He seemed confused, lethargic, and his speech was slow. He was taken to the emergency room at Cox North Hospital, and admitted to the psychiatric unit under the care of psychiatrist Dr. Kenneth Fattmann. The psychiatrist diagnosed Defendant as suffering from a major depressive disorder with psychotic features. Defendant remained hospitalized for 17 days and was prescribed medication to aid a recovery. According to Defendant's religious beliefs, however, he felt that taking medication was a moral and spiritual failure, and that he should trust in God for his healing.

In October of 1996, Defendant was again hospitalized for eleven days in the psychiatric unit following a suicide attempt by cutting his wrists with a filet knife. He was again diagnosed as suffering from ma-

jor depression recurrent with psychotic features. The psychiatrist treating him, Dr. Edgar Galinanes, prescribed an antidepressant and a prescription to treat auditory hallucinations. After his release, Defendant received no follow-up care, and did not take his medication on a regular basis.

Defendant made four more attempts to commit suicide by slitting his wrists, taking pills, and by drinking lamp oil. Defendant believed that God would not let him die because no one would be left to care for his wife. Defendant was convinced that he needed to take his wife with him in order to leave – he had to take her life to take his own.

At the time of the killing, Defendant had not been taking anti-psychotic medications for more than a month.

### Point I

■ Defendant claims the trial court erred by not granting his motion to strike venireperson Carey Stubblefield. The defense filed a motion to strike Stubblefield for cause based upon the assertion that Stubblefield did not believe that a defense of mental disease or defect could ever justify a verdict of not guilty. An appellate court will not disturb a trial court's ruling on its determination of whether to strike a venireperson for cause unless the record reflects both a clear abuse of discretion, and a real probability of injury to the complaining party. *State v. Wise*, 879 S.W.2d 494, 512 (Mo. banc 1994), *cert. denied*, 513 U.S. 1093, 115 S.Ct. 757, 130 L.Ed.2d 656 (1995).

■ Venirepersons may be excluded only where their views would prevent or substantially impair the performance of their duties as jurors in accordance with the instructions and their oath. *State v. Rousan*, 961 S.W.2d 831, 839 (Mo.banc), *cert. denied*, 524 U.S. 961, 118 S.Ct. 2387, 141 L.Ed.2d 753 (1998). If it appears that a venireperson cannot apply the proper

1. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

burden of proof or otherwise follow the court's instructions in a first-degree-murder case, then the juror can be stricken for cause. *Id.* The qualifications of a prospective juror are not determined conclusively by a single response, but are determined on the basis of the voir dire as a whole. *Id.*

Defendant singles out one answer Venireperson Stubblefield gave during voir dire. In his brief, Defendant recites Stubblefield's answer that a person's mental disease or defect would not be strong enough in order to find him not guilty. When read in context, however, it is apparent that the prosecutor's question presented to Venireperson Stubblefield was not clearly worded. Additionally, there were many other instances when Stubblefield did not respond to questioning along the same line. The pertinent parts of voir dire follow:

> MR. CARRIER: ... But the bottom line under Missouri law is that it is the determination and responsibility and the decision of the jury to decide whether the defendant had a mental disease or defect at the time of the offense which excluded responsibility. Is there anybody who feels that they could not make that type of decision? Okay. I see no response....
>
> Now, another thing that I want to talk about in Missouri law is that under Missouri law a person can have a mental disease or defect and still be responsible for their actions. There's two different parts to the analysis.
>
> The issues are, number one, is – did the defendant have a mental disease or defect at the time of the offense. And then number two, did that mental disease or defect exclude him from responsibility in this case? Is there anybody who would have difficulty in – about distinguishing between those two issues?
>
> Ms. Stubblefield, in this situation, if you have a – in this case that there's evidence that the defendant had a mental disease or defect at the time of the

offense, would you automatically then find him not guilty if that's what the evidence showed that he had no mental disease or defect at the time of the offense?

> VENIREPERSON STUBBLEFIELD: No.
>
> MR. CARRIER: And why not?
>
> VENIREPERSON STUBBLEFIELD: I just don't feel it would – I(sic) would be strong enough in order to find him guilty that –
>
> MR. CARRIER: Okay. To find him guilty or not guilty?
>
> VENIREPERSON STUBBLEFIELD: Not guilty.
>
> MR. CARRIER: Not guilty?
>
> Do you understand, then, that the other part of that analysis is that if you find that he had a mental disease or defect at the time of the offense, that the other part that you have to find is the issue that the mental disease or defect prevented him from having responsibility –
>
> VENIREPERSON STUBBLEFIELD: Yes –
>
> MR. CARRIER: Do you understand that?
>
> VENIREPERSON STUBBLEFIELD: Yes.
>
> MR. CARRIER: Okay. Is there anybody who does not understand that principle or disagrees with that principle in Missouri law that there are two different parts of this equation, whether the defendant has a mental disease or defect at the time of the offense and whether that mental disease or defect prevented him from having responsibility for his actions? (No response.)

Voir dire by defense attorney, Dee Wampler:

> MR. WAMPLER: ... Do any of you, from what you've heard about this case so far, do you have any assumptions or feelings or opinions about the case or about Richard Dean Floyd being guilty already from what you've heard about

the case? In other words, are you leaning at this time towards guilt or leaning towards not guilty, based on anything either that's been said today or anything that you've heard or read about the case? Anything at all?

Is it a clean slate? ...

. . .

MR. WAMPLER: And Ms. Stubblefield –
VENIREPERSON STUBBLEFIELD: Yes.

Defense counsel further questioned the venire panel members concerning the State's burden of proof on the issue of mental disease or defect, whether they felt the defense of mental disease or defect was just a loophole, and whether they felt that depression could never count as a mental disease or defect. None of the venire panel members, including Ms. Stubblefield, responded affirmatively to these questions.

■ Considering voir dire as a whole, not isolating a single response, we conclude that the trial court did not abuse its discretion when it denied the motion to strike Venireperson Stubblefield. Because we do not find an abuse of discretion, it is not necessary to determine if there was a real probability of injury to Defendant. *See Wise*, 879 S.W.2d at 512. Point I is denied.

### Point II

■ Defendant alleges the trial court erred in overruling his motion to suppress statements in that the statements were not voluntary, knowing and intelligently made under the totality of the circumstances. Appellate review of motions to suppress is limited to a determination of whether sufficient evidence exists to sustain a trial court's holding. *Wise*, 879 S.W.2d at 503.

Defendant filed a Motion to Suppress Statements on April 19, 1998 alleging that the statements were not voluntary. A hearing was held on the motion on May 1, 1998. Defendant argues that the trial

court did not make a finding of voluntariness of his statements, and in fact misstated the law in regard to the court's duty. The trial court stated the following:

THE COURT: ... the Court does not have the determination of voluntariness of a statement. That is a jury determination. The Court's obligation is to determine whether the State has sufficient evidence to show, or whether the State has shown, sufficient evidence to permit a jury to believe that the statement is voluntary.

■ Defendant's argument in this regard is valid. When a defendant challenges the admission of a statement on the grounds of involuntariness, the trial court must make a clear cut determination of voluntariness before the finder of fact can consider the statement. *State v. Nolin*, 833 S.W.2d 456, 458 (Mo.App.1992). *See also State v. Knese*, 985 S.W.2d 759, 767 (Mo.banc), *cert. denied*, 526 U.S. 1136, 119 S.Ct. 1814, 143 L.Ed.2d 1017 (1999). When the record made by the trial court fails to show with "unmistakable clarity" that Defendant's statement was voluntarily made, we can request the trial court make appropriate findings on the record. *See Nolin*, 833 S.W.2d at 458.

This court issued an Order to the trial court on January 6, 2000, directing that additional findings of fact be made concerning the voluntariness of Defendant's statements. The trial court reviewed the trial transcript, and conducted an evidentiary hearing on March 24, 2000, to receive further evidence on the issue. Based upon that record, the trial court made specific findings of fact on March 25, 2000. The findings were filed here, becoming a part of the record. The trial court found:

1. Defendant was given the required Miranda warnings before the interrogations by law enforcement officers and Defendant voluntarily, knowingly and intelligently waived those rights and voluntarily made statements.

2. Defendant was calm, coherent and intelligently responsive during each interrogation by law enforcement officers when the statements were made.

3. Defendant's physical and mental condition, background and emotional state, considered separately or as a whole, did not prevent Defendant from understanding his rights as explained by the law enforcement officers and did not prevent Defendant from voluntarily, knowingly and intelligently waiving those rights and voluntarily making the statements.

4. Defendant's statements to law enforcement officers were voluntarily made.

■ We now consider whether there was sufficient evidence to sustain these findings. The statements Defendant sought to suppress included a statement given to Detective Arnott while in route to the sheriff department when Detective Arnott asked Defendant: "What happened this morning?" Defendant replied: "I killed my wife." The *Miranda* rights had been read to Defendant twice before he made this statement. After arriving at the Sheriff's Department, and after signing a wavier, Defendant gave Detective Arnott a complete statement explaining how he had killed his wife. The statement recalled the events related hereinabove.

■ The test for voluntariness is whether the totality of the circumstances deprived defendant of a free choice to admit, to deny, or to refuse to answer, and whether physical or psychological coercion was of such a degree that defendant's will was overborne at the time he confessed. *Nolin*, 833 S.W.2d at 459. In review of the trial court's denial of a motion to suppress, this court looks only to determine whether the evidence was sufficient to support the ruling. *State v. Burkhardt*, 795 S.W.2d 399, 404 (Mo.banc 1990). From the record before us, we must decide whether there was adequate evidence to support the trial court's action. *Id.*

There was no evidence of police coercion presented at the hearing on the motion. At the scene of the crime, Defendant spent about fifteen minutes waiting in a patrol car before being transported to the police station. The total time that Detective Arnott spent with Defendant, from the time he took custody of him at the crime scene to the time he finished interviewing him, was sixty to ninety minutes. Once at the Sheriff's Department, Detective Arnott again read Defendant his rights, and Defendant placed his initials beside each line that enumerated his rights, and signed the waiver form.

After giving one statement, Defendant agreed to repeat the statement, and allowed an audio recording of the second statement. Detective Arnott testified that while in custody, Defendant appeared calm, followed orders, gave precise answers to questions, and did not exhibit unusual behavior. Defendant was read his *Miranda* rights three times, and each time he said he understood those rights. Defendant never requested to speak to an attorney nor requested to stop the questioning, and the duration of his contact with the detective was not excessive or unreasonable.

Detective Arnott testified, without contradiction, that Defendant gave no appearance of being unaware of the events taking place, and appeared to be in a normal state of mind. The testimony was sufficient to carry the State's burden that Defendant voluntarily, knowingly, and intelligently waived his Constitutional rights and then confessed. The evidence at the suppression hearing was uncontradicted and is sufficient to sustain the trial court's findings. Point II is denied.

### Point III

■ Defendant alleges trial court error in overruling his motion for acquittal, and error for sentencing him, because he proved he was suffering from a mental disease or defect excluding him of responsibility. Defendant concedes that the stat-

utory presumption of sanity is substantial evidence to take this issue to the jury, however he argues that the evidence should be rebuttable, and therefore apparently reviewable by the appellate court. This point must be denied.

Section 552.030.6, RSMo 1994 provides as follows:

All persons are presumed to be free of mental disease or defect excluding responsibility for their conduct ... The issue of whether any person had a mental disease or defect excluding responsibility for such person's conduct is one for the trier of fact to decide upon the introduction of substantial evidence of lack of such responsibility.... Upon the introduction of substantial evidence of lack of such responsibility, the presumption shall not disappear and shall alone be sufficient to take that issue to the trier of fact....

 In *State v. Moss*, 789 S.W.2d 512 (Mo.App.1990), the court reviewed a similar argument as presented by Defendant. Moss argued that the trial court should have directed a verdict of acquittal at the close of all the evidence based on evidence that he was suffering from a mental disease or defect excluding him from responsibility at the time he committed the acts charged. *Id.* at 513. His argument was rejected, the court thereby refusing to take the issue out of the hands of the jury. "By statute, the defendant is presumed to be free from mental disease or defect and that presumption alone is sufficient to take the issue to the jury even when it is controverted by substantial and uncontradicted evidence to the contrary." *Id.* at 513–14. In this case, there was evidence regarding Defendant's mental disease or defect, as it related to his responsibility for the murder of his wife. By statute, resolution of this issue was for the jury, and we will not take that responsibility out of their hands. Point III is denied. The trial court did not err in denying Defendant's motion for acquittal.

*Point IV*

 Finally, Defendant alleges the trial court erred in failing to grant his motion to dismiss based upon prosecutorial and police misconduct. The alleged misconduct was a failure to allow Defendant's medical experts access to him for purposes of mental examinations for several weeks after his arrest. Defense counsel filed a motion to dismiss for prosecutorial/police misconduct that was overruled in May of 1998. The dismissal of an indictment is a matter for the discretion of the trial judge, which is reviewed for an abuse of that discretion. *State v. Collins*, 669 S.W.2d 933, 935 (Mo.banc 1984).

The central complaint of Defendant on this issue is that because his defense hinged upon his state of mind at the time of the crime, it was critical that his medical experts examine him as soon as possible after his arrest. Defendant asserts that the "prosecutor and the Greene County Jail staff acted together to deny Richard's experts access to him."

Defendant was taken to the Greene County Jail on the day of his arrest, October 3, 1997. The rule of that facility is to only allow contact visits between an attorney and his or her client, and that outside doctors are only allowed to see a defendant in jail if they had a court order. Defendant's attorney hired Dr. Whipple, a psychologist who also worked for the Greene County Jail. Dr. Whipple examined Defendant for one and one-half hours on October 5, 1997, and again the next day for one hour. On October 6, the Chief of the Greene County Jail, Jimmy Hensley, learned that Dr. Whipple had been hired by Defendant. Hensley asked Dr. Whipple to cease examining Defendant because it could present a conflict of interest for a jail supervisor to be hired on behalf of an inmate.

On October 9, 1997, defense counsel and the prosecutor agreed that Dr. Bland would examine Defendant on the following day. Also on October 9, Defendant ob-

tained a court order that stated that after Dr. Bland finished his examination of Defendant, then Defendant's doctors could have access to Defendant. Dr. Bland examined Defendant from 9:00 a.m. to 12:00 p.m. at the jail on October 10, 1997. During Dr. Bland's examination, Defendant's doctor, Dr. Fattmann, attempted to see Defendant, but the jail officers stated that Defendant was still being examined by Dr. Bland, and the court order required Dr. Fattmann to wait until Dr. Bland was finished with his examination.

On October 28, 1997, prosecutors obtained an indictment against Defendant, and on October 30, 1997, the original case was dismissed. The next day, October 31, 1997, Defendant's doctor, Dr. Burstin, sought to examine Defendant at the jail. The chief of the jail advised him that the court order was no longer valid since the original case had been dismissed, and was not allowed to examine Defendant.

Dr. Fattmann attempted to examine Defendant on November 7, 1997, but was not allowed to do so because he did not have a valid court order. On November 21, 1997, the trial court ordered that Defendant be furloughed and transported to his doctor's office for examination. On November 25 [th] or 27 [th], Dr. Fattmann examined Defendant at the doctor's office. At trial, Dr. Fattmann testified that his opinion was that Defendant's mental condition on the day he murdered his wife was severe enough to exclude responsibility for his actions.

On November 24, 1997, Dr. Davidson, also hired on behalf of Defendant, examined Defendant at the doctor's office. Dr. Logan also examined Defendant on a date not set forth in the record.

■ Prison administrators are to be accorded wide-ranging deference in the adoption and execution of policies and practices that, in their judgment, are needed to preserve internal order and discipline and to maintain institutional security. *Block v. Rutherford,* 468 U.S. 576, 104 S.Ct. 3227, 3232, 82 L.Ed.2d 438 (1984). Prison administrators are given statutory authority to determine those persons allowed to enter a correctional facility. Section 217.265.1, RSMo 1994 states:

> Except as provided [herein] no person shall be permitted to enter a correctional center except by special permission of the chief administrative officer of the facility, the division director, the department director or under such regulations as they shall prescribe.

The regulation established by the Greene County Jail allowed contact visits only between inmates and attorneys. Other contact visits with inmates required a court order. This rule was established under statutory authority and appears to be a reasonable rule. The evidence does not support Defendant's claim of bad faith on the part of the state, and there is no evidence of prosecutorial misconduct. The delay in medical examinations is sufficiently explained by the circumstances set forth above, and prejudice was not established. Point IV is denied.

The judgment is affirmed.

MONTGOMERY, P.J., and GARRISON, C.J., concur.