

# In the
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

No. 06-23-00076-CV

TEXAS DEPARTMENT OF TRANSPORTATION
AND VULCAN MATERIALS COMPANY, Appellants

V.

KRISTINA SMITH, INDIVIDUALLY AND AS REPRESENTATIVE OF THE ESTATE
OF JENNIPHER SMITH, AND AS NEXT FRIEND OF N.J. AND B.J., Appellees

On Appeal from the 71st District Court
Harrison County, Texas
Trial Court No. 21-0667

Before Stevens, C.J., van Cleef and Rambin, JJ.
Memorandum Opinion by Justice Rambin

## MEMORANDUM OPINION

In the early evening of November 3, 2020, Jennipher Smith lost control of her vehicle when she encountered loose, marble-sized debris on Farm-to-Market Road (FM) 134 between Jonesville and Waskom. Jennipher's vehicle slid off the road, down an embankment, and into several trees. Her daughter, N.J.,[1] was also in the vehicle and was injured. Jennipher walked up to the roadway to try to get help. About that time, another driver, Alexis Smith, encountered the loose debris, lost control of her vehicle, and slid into Jennipher, killing her.

The debris was on a section of highway that had recently been repaved by the Texas Department of Transportation (TxDOT) using material supplied by Vulcan Materials Company (Vulcan). TxDOT had placed warning signs along and ahead of the work zone, including signs warning of loose gravel.

As a result of this tragic accident, Jennipher's mother, Kristina Smith, filed wrongful death and survival actions on behalf of herself and Jennipher's children, N.J. and B.J., against TxDOT and Vulcan. The jury found TxDOT negligent regarding a premises defect and found Vulcan liable for a marketing defect. The trial court entered judgment in favor of Kristina, N.J., and B.J. In accordance with the law, the trial court awarded damages on the verdict.[2] TxDOT and Vulcan appealed.

---

[1] To protect their privacy, we refer to any person who was a minor when the underlying suit was filed by their initials. *See* TEX. R. APP. P. 9.9(a)(3).

[2] *See* TEX. CIV. PRAC. & REM. CODE ANN. § 101.023(a) (limiting "money damages in a maximum amount of $250,000 for each person and $500,000 for each single occurrence for bodily injury or death").

On appeal, TxDOT asserts that there is no evidence to support the jury's findings that (1) TxDOT failed to adequately warn of the danger posed by the condition of the road, (2) TxDOT had actual knowledge of the danger posed by the condition of the road at the time of the accident, or (3) Jennipher lacked actual knowledge of the danger posed by the condition of the road. Because there is no evidence that TxDOT failed to adequately warn of the danger posed by the condition of the road, we reverse the trial court's judgment against TxDOT.

In its appeal, Vulcan asserts, among other things,[3] that it did not have a duty to warn TxDOT and its employee end users about using its product beyond its shelf life. Because we agree that Vulcan did not have a duty to warn TxDOT and its employee end users about using its product beyond its shelf life, we reverse the trial court's judgment against Vulcan.

## I. TxDOT's Warning Decisions Here Were Discretionary, and Hence, Immune.

### A. Background

In July 2020, TxDOT began a maintenance project to overlay portions of the surface of FM 134 in Harrison County, between FM 1999 and U.S. Highway 80 (the FM 134 Project). Prior to beginning the work, TxDOT placed "LOOSE GRAVEL" and "no center line" warning signs just south of FM 1999 and approximately every two miles thereafter to near U.S. Highway 80. The signs were placed to the right of both the southbound and northbound lanes and faced

---

[3]Vulcan also asserts that there was (1) legally insufficient evidence to support the jury's finding that there was a marketing defect, (2) legally insufficient evidence to support the jury's finding that any marketing defect was the producing cause of the occurrence, (3) legally and factually insufficient evidence to support the jury awards for past and future mental anguish to Appellees in connection with Jennipher's death, and (4) legally insufficient evidence to support the jury awards for physical pain and past or future mental anguish for N.J.'s injuries from the accident. It also asserts that the trial court abused its discretion in admitting the testimony of Appellees' expert, Dr. Gary Kronrad, on past and future mental anguish and loss of companionship, loss of inheritance, and loss of pecuniary support. Finally, Vulcan asserts that the trial court erred in not instructing the jury that a defective warning is not a producing cause of injuries if the end user knew of the condition allegedly causing the injuries.

3

the traffic traveling in each lane. Between FM 1999 and where Jennipher lost control of her vehicle, there were five loose gravel signs facing the southbound lane of FM 134. Uncontested testimony shows that each of those signs was in place on the night of the accident.[4]

Limestone rock asphalt (LRA) was used for most of the overlays on the FM 134 Project. LRA is limestone rock with naturally occurring asphalt or bitumen. On November 3, TxDOT laid an LRA overlay on a section of the southbound lane of FM 134, about one mile southeast of Jonesville (the November 3 overlay).[5] John Robicheaux, a TxDOT employee who testified by deposition, was on the crew that laid the November 3 overlay. He testified regarding the general procedure for an LRA overlay and how the LRA is compacted, and to his recollection, the procedure was followed that day. He also testified that the crew walked the entire overlay before they left, and he did not see any gravel on the road or anything wrong with the overlay. He thought they left the job site around 3:00 p.m.

John Hines was the TxDOT crew chief that day and testified by deposition. He also testified regarding the general procedure for an LRA overlay. He testified that, after the LRA is compacted, the crew looks at the overlay to make sure it is not "hulling out" and, if there is a problem, they do not "let it stay down." Hines also testified that the crew walked the entire overlay before they left, he did not see anything unusual or any loose aggregate, and the LRA

---

[4]In his opening statement, Appellees' attorney informed the jury that the loose gravel and no center line "signs ha[d] been up since the summer through after November 3rd of 2020" and introduced, without limitation, a map made by TxDOT that showed the location of the signs.

[5]Between July and October, TxDOT laid at least nine other LRA overlays on sections of FM 134, including the northbound lane of the subject section. Neither party introduced any evidence of any accidents related to those overlays.

appeared to compact as it normally would. He thought they left the job site between 3:30 and 4:00 p.m.

Nevertheless, when Jennipher and Alexis encountered the overlay about two hours later, the LRA had "shell[ed] or ravel[ed]," that is, the aggregate had come out of the mix and formed a layer of rock on the overlay. When Jennipher encountered the overlay, she lost control of her vehicle, which slid off the road, slid down an embankment, and hit several trees. Because her daughter, N.J., was also in the vehicle, Jennipher walked up to the roadway to try to get help. About that time, Alexis lost control of her vehicle when she encountered the loose gravel, slid in Jennipher's direction, and struck and killed Jennipher.

In his crash report concerning Jennipher's vehicle, Texas Department of Public Safety (DPS) Trooper Jim Hargett described the layer of rock as "very loose gravel." At trial, his recollection of the gravel was that it was like "small ice particles" and "very, very small, about the size of [his] thumbnail or fingernail." In his fatality report concerning Jennipher and in his crash report concerning Alexis's vehicle, DPS Trooper Richard Matlock also described the layer of rock as "VERY LOOSE GRAVEL." At trial, he testified that it was "like a bunch of marbles laying on the road." Although he initially testified that the TxDOT crew had left the road "in horrible shape," he agreed he did not know what the condition of the road was when TxDOT left that afternoon, and he did not know whether TxDOT left the road with loose gravel. Both Hargett and Matlock testified that they had never seen TxDOT leave a roadway with the degree of loose gravel they saw the night of the accident.

Wendy Starkes is a licensed professional engineer in Texas. She was the area engineer for the Marshall area of TxDOT during the FM 134 Project. She testified that she prepared the map of the FM 134 Project that showed all the work that was performed, the material used, the date range, and the location of the loose gravel and no center line signs[6] on the project. She explained that the first step in an overlay process is putting up the loose gravel and no center line signs.

Starkes testified that TxDOT has a standard for placement of signs in an overlay project called a traffic control plan, TCP 7-1, which provides that loose gravel and no center line signs be placed about every two miles.[7] She testified that the purpose of the document is to give "guidance on what type of signage [is] applicable for surfacing operations." She opined as a licensed professional engineer that the signs placed in the FM 134 Project were in compliance with TCP 7-1 and with the Texas Manual on Uniform Traffic Control Devices (TMUTCD). The TMUTCD directs "what kind of traffic control [should be] use[d] in what situations, . . . when certain signs are appropriate, what sizes the signs have to be, [and] what colors they have to be."

---

[6]Based on personally driving a portion of the project the morning after the crash and verification from the maintenance department, Starkes testified that the map accurately depicted the signs installed on the project prior to and at the time of the accident. She explained that, although the map showed that one sign was missing, in fact it was present at the time of the accident, but it was missing the following morning.

[7]TxDOT TCP (7-1)-13 provides:

    A.    When construction begins a LOOSE GRAVEL (CW8-7) sign should be erected at each end of the work area and repeated in intervals of approximately 2 miles in rural areas and closer in urban areas.

    B.    The LOOSE GRAVEL signs are to remain in place until the condition no longer exists.

6

She explained that the signs are placed every two miles to remind the driver that a condition either exists or could exist. She opined that it is a reasonable distance to remind a driver of a potential condition. Starkes also testified that the TMUTCD states,

> Warning signs call attention to unexpected conditions on or adjacent to a highway, street, or private roads open to public travel and to situations that might not be readily apparent to road users.
>
> Warning signs alert road users to conditions that might call for a reduction of speed or an action in the interest of safety and efficient traffic operations.

She opined that the loose gravel signs both call for a reduction of speed and alert the driver that the condition may be present. In her opinion, they are appropriate any time there is any kind of loose gravel on the roadway. Starkes also testified that there are no other signs in the TMUTCD that are used to warn of loose gravel. In her opinion, based on her engineering judgment, the sign placement on the FM 134 Project was reasonable, and the signs were adequate warnings for motorists of loose gravel. As the area engineer and in her engineering judgment, she thought the signs were placed at appropriate intervals on the FM 134 Project. Further, as TxDOT's engineer in charge of the road at the time of the accident, the signs were placed where she wanted them to be.

Appellees sued TxDOT, the jury found that TxDOT was negligent for a premises defect, and the trial court entered judgment in accordance with the jury's verdict. On appeal, TxDOT argues, among other things, that the discretionary function exception to the Texas Tort Claims Act (the Act) precludes the waiver of its sovereign immunity for its decisions on the type and placement of warning signs and that Appellees provided no evidence that TxDOT failed to adequately warn Jennipher of the dangerous condition of the road. *See* TEX. CIV. PRAC. & REM.

7

CODE ANN. § 101.056; *State v. Miguel*, 2 S.W.3d 249, 250–51 (Tex. 1999) (per curiam). Appellees argue that TxDOT remains liable because the "LOOSE GRAVEL" signs were not close to the overlay, that the signs did not warn of the particular hazard, and that the discretionary function exception to the waiver of sovereign immunity does not apply to special defects. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 101.060(c).

### B.       Applicable Law and Standard of Review

"Generally, the State of Texas and its agencies retain sovereign immunity from suit unless the Legislature clearly and unambiguously waives it." *Christ v. Tex. Dep't of Transp.*, 664 S.W.3d 82, 86 (Tex. 2023) (citing *Univ. of Tex. at Austin v. Hayes*, 327 S.W.3d 113, 115 (Tex. 2010) (per curiam)). "[S]overeign immunity implicates a trial court's subject-matter jurisdiction . . . ." *Id.* (citing *Sampson v. Univ. of Tex. at Austin*, 500 S.W.3d 380, 384 (Tex. 2016)). "[S]ubject-matter jurisdiction is never presumed and cannot be waived . . . ." *Tex. Dep't of Transp. v. Self*, 690 S.W.3d 12, 20 (Tex. 2024) (citing *Tex. Ass'n of Bus. v. Tex. Air Control Bd.*, 852 S.W.2d 440, 443–44 (Tex. 1993)). As a result, "the issue can '"be raised for the first time on appeal by the parties or by the court," [and] a court is *obliged* to ascertain that subject matter jurisdiction exists regardless of whether the parties have questioned it.'" *Id.* (alteration in original) (quoting *Univ. of Tex. Sw. Med. Ctr. at Dallas v. Loutzenhiser*, 140 S.W.3d 351, 358 (Tex. 2004), *superseded on other grounds by* TEX. GOV'T CODE ANN. § 311.034). "Whether a court has subject matter jurisdiction is a question of law . . . ." *Christ*, 664 S.W.3d at 86 (quoting *Sampson*, 500 S.W.3d at 384).

8

The Act expressly waives the State's sovereign immunity for tort claims, but only "to the extent the Act creates liability." *State ex rel. State Dep't of Highways & Pub. Transp. v. Gonzalez*, 82 S.W.3d 322, 326 (Tex. 2002) (citing TEX. CIV. PRAC. & REM. CODE ANN. § 101.025(a)). As applicable to this appeal, the Act waives sovereign immunity for "personal injury and death so caused by a condition . . . of . . . real property if the governmental unit would, were it a private person, be liable to the claimant." TEX. CIV. PRAC. & REM. CODE ANN. § 101.021(2); *see State v. Rodriguez*, 985 S.W.2d 83, 85 (Tex. 1999) (per curiam), *abrogated on other grounds by Denton Cnty. v. Beynon*, 283 S.W.3d 329 (Tex. 2009). Where, as here, "a plaintiff's claim arises from a premises defect, then the government's duty is generally limited to 'the duty that a private person owes to a licensee on private property.'" *Christ*, 664 S.W.3d at 86 (quoting TEX. CIV. PRAC. & REM. CODE ANN. § 101.022(a), (c)).

Nevertheless, "the Act establishes various exceptions to this general waiver." *Gonzalez*, 82 S.W.3d at 326. Under Section 101.056, "[t]he Act's waiver of immunity 'does not apply to a claim based on . . . a governmental unit's decision not to perform an act or on its failure to make a decision on the performance or nonperformance of an act if the law leaves the performance or nonperformance of the act to the discretion of the governmental unit.'" *Tex. Dep't of Transp. v. Ramirez*, 74 S.W.3d 864, 866–67 (Tex. 2002) (per curiam) (quoting TEX. CIV. PRAC. & REM. CODE ANN. § 101.056(2)). "For instance, the '[d]esign of any public work, such as a roadway, is a discretionary function involving many policy decisions, and the governmental entity responsible may not be sued for such decisions.'" *Id.* at 867 (alteration in original) (quoting *Rodriguez*, 985 S.W.2d at 85). "Likewise, decisions about installing safety features are

9

discretionary decisions for which the State may not be sued." *Id.* (citing *Miguel*, 2 S.W.3d at 251; *Maxwell v. Tex. Dep't of Transp.*, 880 S.W.2d 461, 463 (Tex. App.—Austin 1994, writ denied)).

Further, "under section 101.060, the State does not waive its sovereign immunity for claims arising from 'the failure of a governmental unit initially to place a traffic or road sign, signal, or warning device if the failure is a result of discretionary action of the governmental unit.'" *Rodriguez*, 985 S.W.2d at 85 (quoting TEX. CIV. PRAC. & REM. CODE ANN. § 101.060(a)(1)). In *Rodriguez*, the Texas Supreme Court found that, "under Section 101.060[,] the State retained its immunity for warning sign placement because it also was a discretionary act and because the detour was not a special defect."[8] *Id.* at 86 (citing TEX. CIV. PRAC. & REM. CODE ANN. § 101.060).

---

[8]Under Section 101.060(c), "the State waives immunity for 'the duty to warn of special defects such as excavations or roadway obstructions.'" *Rodriguez*, 985 S.W.2d at 85 (quoting TEX. CIV. PRAC. & REM. CODE ANN. § 101.060(c)). "Whether a condition is an ordinary premise defect or a special defect is a question of law." *Id.* (citing *State Dep't of Highways v. Payne*, 838 S.W.2d 235, 238 (Tex. 1992)). In *Denton County v. Beynon*, the Texas Supreme Court explained that "the [Act] speaks of 'special defects such as excavations or obstructions' that impede travel on the roadway." *Denton Cnty.*, 283 S.W.3d at 332. Consequently, "a court cannot 'classify as "special" a defect that is not like an excavation or obstruction on a roadway.'" *Id.* at 331–32 (quoting *Payne*, 838 S.W.2d at 239 n.3). The court noted that "the [the Act] does not posit an alternative basis for special-defect liability when a condition, while not an excavation or obstruction, is out of the ordinary." *Id.* at 332. Also, the Texas Supreme Court has held that loose gravel on a roadway "'does not form a hole in the road or physically block the road like an obstruction or excavation,' nor does it 'physically impair a car's ability to travel on the road in the manner that an excavated road or obstruction blocking the road does.'" *Tex. Dep't of Transp. v. Gutierrez*, 284 S.W.3d 848, 850 (Tex. 2009) (per curiam) (quoting *Tex. Dep't of Transp. v. York*, 284 S.W.2d 844, 847 (Tex. 2009) (per curiam)). As a result, loose gravel on a roadway "falls outside the 'special defect' class as a matter of law. Instead, it 'falls in the same class as ordinary premise defects—those conditions that do not reach the level of an obstruction or excavation.'" *Id.* (quoting *York*, 284 S.W.2d at 847). In *York*, the court acknowledged that, if "a sizeable mound of gravel were left on the roadway," it could fall within the class of special defects. *Tex. Dep't of Transp. v. York*, 284 S.W.3d 844, 848 (Tex. 2009) (per curiam). However, neither the testimonial, nor recorded, nor photographic evidence in this case showed that a sizeable mound of LRA was left on the highway such that it would block the roadway in the same manner as an obstruction or excavation. As a result, we find that the loose LRA in this case was not a special defect.

Appellees argue that four Texas courts of appeals have held that excessive gravel can constitute a special defect. However, the Texas Supreme Court reversed two of the cited cases on this issue, *see York*, 284 S.W.2d at

## C.  Analysis

Because Appellees asserted a premises defect claim against TxDOT, TxDOT owed them "the duty that a private person owes to a licensee on private property." TEX. CIV. PRAC. & REM. CODE ANN. § 101.022(a)). That duty required TxDOT to "use ordinary care either to warn a licensee of, or to make reasonably safe, a dangerous condition of which the owner [was] aware and the licensee [was] not." *State Dep't of Highways v. Payne*, 838 S.W.2d 235, 237 (Tex. 1992). As a result, to establish TxDOT's liability, Appellees were required to prove, among other things, that TxDOT failed to adequately warn Jennipher of the condition of the road.[9]

Adequacy of warnings regarding road construction, however, raises another aspect of sovereign immunity: discretionary decisions by the State. In *Miguel*, TxDOT put barrels in front of part of an elevated exit ramp's missing railing to serve as a temporary warning device. A van struck the barrels, went over a concrete wall, and fell sixty feet to the ground, resulting in the death of the driver and two passengers. *Miguel*, 2 S.W.3d at 250. On appeal of an adverse jury verdict against TxDOT, the Texas Supreme Court noted that, under Section 101.056, the

---

847–48, and *Gutierrez*, 284 S.W.3d at 850, and the other two were decided prior to the Texas Supreme Court opinions in *York* and *Guiterrez*.

[9]To find TxDOT liable, the trial court's charge required the jury to find that:

    a.     The condition of the premises posed an unreasonable risk of harm; and

    b.     [TxDOT] had actual knowledge of the danger, if any, presented by said condition; and

    c.     Jennipher Smith did not have actual knowledge of the danger presented by said condition, if any; and

    d.     [TxDOT] failed to exercise ordinary care to protect Jennipher Smith from danger, by both failing to adequately warn her of any unreasonable risk of harm caused by said condition, if any, and by failing to make any such condition reasonably safe.

11

State's immunity is retained for claims based on its discretionary decisions. *Id.* at 250–51 (citing TEX. CIV. PRAC. & REM. CODE ANN. § 101.056). It then determined that "[d]ecisions about highway design and about what type of safety features to install are discretionary policy decisions." *Id.* at 251 (citing *Maxwell*, 880 S.W.2d at 463–64). Because "[Tx]DOT policy guided [its] crew's decision to use barrels and signs [and t]he barrel and sign warning system the crew chose complied with [Tx]DOT's Manual on Uniform Traffic Control Devices," the court held that "the decision to use barrels and signs, as opposed to another warning device, was discretionary." *Id.* As a result, TxDOT retained its sovereign immunity from Miguel's clams. *Id.*

In *Rodriguez*, a truck driver was killed when his rig failed to complete a ninety-degree turn on a detour, side-swiped a bridge abutment, and rolled over. His widow sued the State and alleged that the detour was unreasonably dangerous and that the warning signs were inadequate. *Rodriguez*, 985 S.W.2d at 85. On appeal, the Texas Supreme Court noted that, "under section 101.060, the State does not waive its sovereign immunity for claims arising from 'the failure of a governmental unit initially to place a traffic or road sign, signal, or warning device if the failure is a result of discretionary action of the governmental unit.'" *Id.* (quoting TEX. CIV. PRAC. & REM. CODE ANN. § 101.060(a)(1)). The court held that, because "[t]he State's traffic engineers decided, in their discretion, where to place the warning signs," the State's immunity was retained for warning sign placement under Section 101.060. *Id.* at 86. In addition, the court held that, based on evidence that the State's area engineer's "office had designed the existing warning

signs according to [its] best engineering judgment[,] . . . the State did not waive its immunity for warning signage." *Id.* (citing TEX. CIV. PRAC. & REM. CODE ANN. § 101.060(a)(1)).

In this case, Starkes, TxDOT's area engineer, testified that the warning signs used and where they were placed, complied with TxDOT policy and with the TMUTCD. In her professional opinion, the "LOOSE GRAVEL" signs were appropriate and adequate to warn of the loose gravel. She also testified that the signs were placed where she, as the engineer in charge, wanted them to be. Appellees did not provide any evidence that the warning signs or their placement did not conform with TxDOT policy or with the TMUTCD. Further, they offered no testimony rebutting Starkes's testimony that the warning signs were appropriate and adequate to warn of the loose gravel.[10]

Under this record, and in accordance with *Miguel* and *Rodriguez*, we hold that TxDOT retained its sovereign immunity for its discretionary decisions regarding what warning signs to use and where they should be placed. *Miguel*, 2 S.W.3d at 251; *Rodriguez*, 985 S.W.2d at 85–86; *see* TEX. CIV. PRAC. & REM. CODE ANN. § 101.056(a)(1). Because "decisions about installing safety features are discretionary decisions for which the State may not be sued," *Ramirez*, 74 S.W.3d at 867, and because an essential element of Appellees' claim is based on these discretionary decisions, under this record, Appellees' claim is barred by TxDOT's

---

[10]In their brief, Appellees asserted that Starkes admitted that the warning signs were inadequate, but failed to cite to any place in the record where she did so.

13

sovereign immunity. Therefore, we sustain this issue, and we reverse the trial court's judgment against TxDOT.[11]

## II. Vulcan Did Not Have a Duty to Warn About Using LRA Beyond Its Shelf Life

On appeal, Vulcan asserts, as it did in the trial court,[12] that it did not have a duty to warn TxDOT and its employees about using LRA beyond its shelf life. It argues that the evidence conclusively showed that TxDOT knew that LRA had a shelf life and that the TxDOT employees who made the decision to use the LRA were aware of the characteristics of LRA when it was beyond its shelf life. We agree.

### A. Background

The evidence at trial relevant to this issue shows that Vulcan delivered a load of LRA to the Marshall Division of TxDOT (TxDOT Marshall) in October 2019 (the October load) and another load of LRA in February 2020 (the February load). It is unclear from the record whether LRA from the October load or LRA from the February load was used on the November 3 overlay.[13]

---

[11]Because this issue is dispositive of TxDOT's appeal, we need not consider its other issues, such as TxDOT's awareness of the condition of the road at the time of the accident.

[12]Vulcan filed a timely motion for judgment notwithstanding the verdict in which it asserted, among other things, that there was legally insufficient evidence that it owed a duty to warn TxDOT and its employees.

[13]Michael Smith, who was the assistant supervisor of the maintenance department at TxDOT Marshall on November 3, testified that, based on his knowledge, the October load was used on the November 3 overlay. However, the testing report produced by TxDOT of the October load before it was shipped showed that the October load was "Type II-DS Fine Surface" LRA. The testing report produced by TxDOT of the February load before it was shipped showed that the February load was "Type I-D Fine Surface" LRA. After the accident, Starkes sent a sample of the load used on the November 3 overlay to TxDOT that was tested on November 23, 2020. The testing report of that sample showed that it was "Type I-D Fine Surface" LRA. Both Starkes and Appellees' expert testified that this indicated that the October load was not used on the November 3 overlay. Also, the daily activity report for the November 3 overlay recited that the LRA used for the overlay was "TYPE I, GRADE D (CUY)."

14

Tim Thompson, Vulcan's sales representative, testified that he tried to go by TxDOT Marshall quarterly and that he called on the maintenance supervisor. Sometimes when he called on TxDOT Marshall, he would leave Vulcan's sales brochure in TxDOT's office. The brochure states that, for both Type I and Type II LRA, "[t]ypical shelf life is 3–6 months depending on weather conditions." Thompson agreed that LRA has a six-month shelf life, "because it's in the brochure." It is undisputed that he never told anyone at TxDOT that LRA had a six-month shelf life. Smith testified that he never saw the brochures and that, if he had known LRA had a six-month shelf life, he would not have used it after six months. Hines testified that he did not know anything about LRA having a shelf life. Matt Burns, who was the maintenance supervisor at TxDOT Marshall on November 3, testified that he knew that LRA had a shelf life and that he believed it was six to twelve months.

Starkes testified that TxDOT's DMS-9210,[14] titled "Limestone Rock Asphalt," sets out the requirements a supplier must meet to supply LRA to TxDOT. She agreed that section 2.4 of DMS-9210 requires supplies to "[u]se fluxing material in the paving mixture to provide materials that remain workable in a stockpile for at least six months" and that it requires the LRA to be workable for six months. She also agreed that a TxDOT's publication titled "Asphalt Materials and Uses" provides, under the heading "*Limestone Rock Asphalt*," that "LRA can be stockpiled for use and can remain workable in the stockpile for six months or more." She had not seen any TxDOT publication that stated that LRA cannot be used after six months. Starkes interpreted "workable" to mean "that you can get the material out of the stockpile and still use it to pave

---

[14]DMS is an acronym for Department Material Specification.

with, so that[ it]'s still workable on the roadway." Starkes did not take the reference to a shelf life in the Vulcan brochure to be a specification or a warning but, rather, part of the sales brochure.

Jill Shackelford, Appellees' expert witness, testified that, in her opinion, "shelf life of six months" is the same as being "workable for six months." She opined that TxDOT used LRA "outside of its recommended stockpile shelf life that's within the specification required by [TxDOT]." She based her opinion on TxDOT's DMS-9210 that requires "a six month stockpile workability life." She explained that, when LRA is no longer workable, it becomes dry or brittle and loses its bonding capacity. She agreed that, if it dries out, it becomes difficult or impossible to be installed correctly. She testified that the LRA shown on recordings from the officer's body camera looked dry and brittle. Shackelford also testified that she was surprised that no one at TxDOT Marshall, even at the supervisor level, knew about a shelf life because it was TxDOT's own specification and was incorporated in the guidance document.

The evidence also shows that, around January 2020, Smith[15] and Burns[16] noticed that the October load of LRA looked too dry, and Smith explained that "[i]t was more of a gray color . . . instead of the blackish brown color when [they] first received it." They picked some up and squeezed it to see if it stayed squeezed, and it did not feel right. They also rubbed some around in their hands, and it was "like powder." Smith explained that, normally, if he rolled it in his hand, he would "have black sticky oil marks." Afterwards, they talked with Thompson, and

---

[15]At the time, Smith had worked in TxDOT Marshall's maintenance department for over fifteen years.

[16]At the time, Burns had worked in TxDOT Marshall's maintenance department for about twenty-four years, had been an assistant maintenance supervisor for ten years, and had been maintenance supervisor for two years.

TxDOT decided to have it repugged, or rejuvenated by adding oil, to make it more usable on the roadway. The October load was repugged in February by a third-party company. That LRA was used for the FM 134 Overlay Project in August, September, and October without incident.

Smith agreed that, on November 3, there were three loads of LRA at the TxDOT Marshall yard: the October load, the February load, and a load that was delivered in October 2020. He testified that the maintenance supervisor or the assistant maintenance supervisor makes the decision on what load to use. He maintained that, on November 3, nothing looked out of place with the October load before it was used. He also testified that, if he, the crew leader, or the crew had noticed something was wrong with it, they would not have used it that day. Crew member Robicheaux testified that the crew walked the entire overlay on November 3 before they left and that he did not see any gravel on the road or anything wrong with the overlay. Crew leader Hines[17] testified that, after the LRA is compacted, the crew looks at the overlay to make sure it is not "hulling out" and that, if there is a problem, they would not let it stay down. Hines also testified that the crew walked the entire overlay on November 3 before they left, that he did not see anything unusual or any loose aggregate, and that the LRA appeared to compact as it normally would. When shown a photograph that depicted what the November 3 overlay looked like after the accident, Hines testified that, if the overlay had looked like that before they left, he would not have allowed the road to be open to traffic because it would be a hazard. According to Hines, they would have worked late and fixed it.

---

[17]At the time, Hines had worked in TxDOT's maintenance department for about twenty-five years and had done over 500 limestone jobs.

**B.  Duty to Warn and Standard of Review**

A manufacturer has a duty to warn of dangers or instruct as to the proper use of a product "if it knows or should know of the potential harm to a user because of the nature of its product." *Am. Tobacco Co. v. Grinnell*, 951 S.W.2d 420, 426 (Tex. 1997) (citing *Bristol-Myers Co. v. Gonzales*, 561 S.W.2d 801, 804 (Tex. 1978)).  "The existence of a duty to warn of dangers or instruct as to the proper use of a product is a question of law." *Id.* (citing *Firestone Steel Prods. Co. v. Barajas*, 927 S.W.2d 608, 613 (Tex. 1996)).  However, there is no duty "to warn of obvious risks," *Caterpillar, Inc. v. Shears*, 911 S.W.2d 379, 382 (Tex. 1995), or "to warn of risks involved in a product's use that are commonly known to foreseeable users, even if some users are not aware of them," *Humble Sand & Gravel, Inc. v. Gomez*, 146 S.W.3d 170, 183 (Tex. 2004) (citing *Joseph E. Seagram & Sons, Inc. v. McGuire*, 814 S.W.2d 385, 388 (Tex. 1991)).  We determine whether a product's risks are obvious, or whether the risks are commonly known to foreseeable users, as a matter of law using an objective standard.  *Caterpillar*, 911 S.W.2d at 383.  Further, "[w]hen the foreseeable users of a product have special training, a supplier has no duty to warn of risks that should be obvious to them, even if persons without such training would not appreciate the risks."  *Humble Sand & Gravel*, 146 S.W.3d at 183; *see Sauder Custom Fabrication, Inc. v. Boyd*, 967 S.W.2d 349, 351 (Tex. 1998) (per curiam).  "What level of appreciation amounts to common knowledge is to be determined by the court as a matter of law unless there are factual issues that must be resolved."  *Id.* (citing *Caterpillar*, 911 S.W.2d at 383).

C. **Analysis**

Appellees argue that Vulcan had a duty to warn the TxDOT employees who moved the LRA and spread it on FM 134 that LRA had a shelf life of six months. However, as noted above, "[w]hen the foreseeable users of a product have special training, a supplier has no duty to warn of risks that should be obvious to them, even if persons without such training would not appreciate the risks." *Id.*

In *Hanna v. Impact Recovery Systems, Inc.*, the Beaumont Court of Appeals applied this principle in a case involving a traffic fatality. *Hanna v. Impact Recovery Sys., Inc.*, 295 S.W.3d 380 (Tex. App.—Beaumont 2009, pet. denied). In that case, Cassandra Humble was fatally injured while riding as a passenger on a motorcycle operated by Gerry Hernandez. *Id.* at 384. Hernandez attempted to change lanes from a service lane to a lane used by traffic that exited from a freeway when he struck a mountable curb system installed by TxDOT "to discourage motorists from going from one lane to the other." *Id.* at 385. Although vertical panels manufactured by the supplier of the curb system were available to attach to the curb system, the representative of the supplier told the TxDOT engineer in charge of the maintenance and design of roadways in the district that the vertical panels were not required to be used. The TxDOT engineer purchased the curb system and had it installed without the vertical panels. *Id.* at 385–86.

The parents and children of Humble sued TxDOT and the supplier and the manufacturer of the curb system. *Id.* at 384. In their suit against the supplier, they alleged the supplier was liable for defective marketing because it represented that the curb system could be used without

19

the vertical panels.  *Id.* at 394–95.  The supplier contended that it did not have a duty to warn or instruct TxDOT on the safe use of the curb system.  *Id.* at 395.

In affirming the summary judgment in favor of the supplier, the court of appeals explained that "[t]he TxDOT employees making the decision to use the [curb system] had special training and also prior experience with different types of lane separators at" the site of the accident.  *Id.* at 396.  The court of appeals concluded that "[t]he possible risk of using the product without delineators would have been known and obvious to TxDOT."  *Id.* (citing *Humble Sand & Gravel*, 146 S.W.3d at 183).  Under those circumstances, the court of appeals concluded that the supplier "had no duty to warn or instruct TxDOT regarding the selection and application of the traffic control system at [that] location."  *Id.* (citing *Humble Sand & Gravel*, 146 S.W.3d at 183).

Similarly, in this case, the TxDOT employees making the decision to use the LRA had the training needed to determine whether the LRA was suitable to use, and the risk of using it if it was unsuitable would have been known and obvious to them.  TxDOT required its LRA[18] suppliers, such as Vulcan, to supply LRA that would remain workable in a stockpile for six months.  Appellees' expert, Shackelford, characterized that as a shelf life and opined that a "shelf life of six months" was the same as "workable for six months."  She went on to explain the importance of LRA being workable:  when it is no longer workable, it becomes dry or brittle and loses its bonding capacity.  As a result, the risk of using the LRA on an overlay when it is no

---

[18]As we have noted, LRA "ha[s] been used by TxDOT since [at least] '1964.'" *Tex. Dep't of Transp. v. Ingram*, 412 S.W.3d 129, 139 (Tex. App.—Texarkana 2013, no pet.).

longer workable is that it will no longer bind together, thereby causing the overlay to be hazardous to traffic traversing over it.

But as the evidence shows, one load of LRA may become unworkable within three or four months, while another may remain workable several months beyond six months. It also shows that, although they may have heard that LRA had a "shelf life," the TxDOT employees who made the determination of whether to use a particular load of LRA, i.e., its maintenance supervisor Burns and its assistant supervisor Smith, knew when a particular load was no longer workable. As Smith described the October load three months after its delivery, it looked dry, was grayish rather than blackish brown, did not feel right when squeezed, and became powder when rubbed in his hands rather than leaving black sticky oil marks on his fingers. Rather than use the October load in that condition, the decision was made to rejuvenate it so it would be usable on the roadway.

That evidence shows that the TxDOT employees who determined whether to use a load of LRA understood that it should not be used when it was unworkable because it had lost its bonding capacity and that they knew how the LRA appeared when it became unworkable. So, the risk to the traveling public of using LRA when it is no longer workable, or past its "shelf life," would be obvious to them. Because they are the ones who determine whether to use any load of LRA, it is their understanding that is pertinent to whether Vulcan had a duty to warn of those risks. *See Hanna*, 295 S.W.3d at 396. Under these circumstances, we conclude that Vulcan had no duty to warn of the risk of using LRA beyond its "shelf life." *See Humble Sand*

21

*& Gravel*, 146 S.W.3d at 183. As a result, we sustain this issue and reverse the trial court's judgment against Vulcan.[19]

## III. Disposition

For the reasons stated, we reverse the trial court's judgment, and render judgment for the Texas Department of Transportation and Vulcan Materials Company.


Jeff Rambin
Justice

Date Submitted:    September 12, 2024
Date Decided:      October 31, 2024

---

[19]Because this issue is dispositive of Vulcan's appeal, we need not address its other issues.